QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
  William R. Sears (Bar No. 330888)
  willsears@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

*Attorneys for Plaintiffs Total Vision, LLC
and Total Vision, P.C.*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOTAL VISION, LLC and TOTAL VISION, P.C., | Case No. _____ |
| Plaintiffs, | COMPLAINT FOR: |
| v. | **1. UNFAIR COMPETITION [Cal. Bus. & Prof. Code § 17200 et seq.];** |
| VISION SERVICE PLAN a/k/a VSP GLOBAL, VISIONWORKS OF AMERICA, INC., VSP VENTURES MANAGEMENT SERVICES, LLC, ALTAIR EYEWEAR, INC., EYEFINITY, INC., MARCHON EYEWEAR, INC., PLEXUS OPTIX, INC., VSP LABS, INC., and EYECONIC, INC. | **2. MONOPOLIZATION [15 U.S.C. §§ 2, 15];** |
| | **3. ATTEMPTED MONOPOLIZATION [15 U.S.C. §§ 2, 15];** |
| | **4. TYING – PER SE ILLEGAL [15 U.S.C. §§ 1, 2, 15];** |
| | **5. TYING – RULE OF REASON [15 U.S.C. §§ 1, 2, 15];** |
| Defendants. | **6. TYING [Cal. Bus. & Prof. Code § 16720 et seq.];** |
| | **7. MONOPOLIZATION – REFUSAL TO DEAL [15 U.S.C. §§ 2, 15];** |
| | **8. INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS.** |
| | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................1

THE PARTIES.............................................................................8

JURISDICTION AND VENUE .....................................................9

FACTUAL BACKGROUND..........................................................9

A.   TOTAL VISION AND VSP.................................................9

B.   VSP'S POWER IN THE VISION INSURANCE MARKET.......................12

VSP'S ANTICOMPETITIVE ACTS ...........................................17

A.   VSP FORCES TOTAL VISION, LLC TO ENTER AN
     ANTICOMPETITIVE RETAIL AGREEMENT .........................17

B.   VSP SHORES UP ITS MONOPOLY AND MARKET POWER BY
     ENTERING THE INDEPENDENT OPTOMETRY MARKET AND
     ACQUIRING INDEPENDENT OPTOMETRY PRACTICES...................22

C.   VSP PRESSURES TOTAL VISION TO LIMIT ITS GROWTH AND
     THREATENS FINANCIAL RUIN IF IT DOES NOT ...............24

D.   VSP COERCES TOTAL VISION, LLC INTO A RENEWED RETAIL
     AGREEMENT THAT UNREASONABLY RESTRAINS
     COMPETITION .............................................................29

E.   VSP TERMINATES THE RETAIL AGREEMENT AFTER TOTAL
     VISION REJECTS VSP'S LATEST ACQUISITION DEMAND..............37

VSP'S ANTICOMPETITIVE ACTIONS HAVE HARMED COMPETITION ....42

A.   THE RELEVANT PRODUCT MARKETS ..............................42

     1.   The First Relevant Product Market:  Independent Optometry
          Practices.................................................................43

     2.   The Second Relevant Product Market: Vision Insurance For
          Independent Optometry Practices .........................47

     3.   The Third Relevant Product Market: Glasses Frames .......48

4.      The Fourth Relevant Product Market:  Glasses Lenses ......................49

5.      The Fifth Relevant Product Market:  Optometry Practice Management Software...........................................................50

B.      VSP'S ANTICOMPETITIVE ACTIONS HAVE HARMED COMPETITION IN THE RELEVANT MARKETS....................................50

C.      TOTAL VISION, LLC AND TOTAL VISION, P.C. HAVE ANTITRUST STANDING...........................................................56

INTERSTATE COMMERCE .................................................59

REQUEST FOR RELIEF ...................................................66

TRIAL BY JURY ................................................67

Plaintiffs Total Vision, LLC and Total Vision, P.C. (collectively, "Total Vision" or "Plaintiffs"), for their complaint against Defendants Vision Service Plan a/k/a VSP Global ("VSP"), Visionworks of America, Inc. ("Visionworks"), VSP Ventures Management Services, LLC ("VSP Ventures"), Altair Eyewear, Inc. ("Altair"), Eyefinity, Inc. ("Eyefinity"), Marchon Eyewear, Inc. ("Marchon"), Plexus Optix, Inc. ("Plexus"), VSP Labs, Inc. d/b/a VSPOne ("VSPOne"), and Eyeconic, Inc. ("Eyeconic," and together with VSP, Visionworks, VSP Ventures, Altair, Eyefinity, Marchon, Plexus, VSP Optical Group, and Eyeconic, "Defendants"), allege as follows:

## INTRODUCTION

1.     This case concerns a vision insurance company that seeks to wield its monopoly power to drive an innovative competitor out of business to the detriment of competition and patients.  Defendant VSP is the largest vision insurer in the country, which gives VSP enormous leverage over independent optometry practices. VSP's ubiquity in the vision insurance market makes it a "must have" for such practices, which must be "in-network" with VSP or else be unable to meaningfully compete in the independent optometry market.  But VSP does not just operate a vision insurance business; over the past two decades, it has also entered a number of related businesses, including its own independent optometry services, glasses frames and lenses, and back-office optometry software.  The problem this has created is that VSP uses the power it derives from its vision insurance business mercilessly to force optometry practices to purchase glasses frames and lenses from its subsidiaries at supracompetitive prices for lower-quality products, purchase its back-office software regardless of whether they want it or not, and, perhaps most insidiously, prevent independent optometry practice groups from growing because *VSP* wants to dominate those services just as it does vision insurance.

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.     Total Vision supports a group of independent optometry practices by acquiring independent optometry practices through Total Vision, P.C. and providing them with centralized nonclinical back-office support through Total Vision, LLC, allowing doctors to focus on patient care, operate their clinical practices under their independent control, and achieve economies of scale.   Each of the optometry practices who joined Total Vision contributed their nonclinical business and administrative functions to Total Vision, LLC, in exchange for an ownership stake in Total Vision, LLC's parent holding company as well as a cash purchase price.   In addition, each optometry practice transferred their clinical assets, including patient records, optometrists, and other licensed employees, to Total Vision, P.C.  Although Plaintiffs are collectively referred to herein as "Total Vision," they are separate entities:    Total Vision, LLC provides nonclinical business and administrative services to Total Vision, P.C., while Total Vision, P.C. owns and operates the optometry practices.[1]  Total Vision, LLC does not provide any medical services and instead solely provides nonclinical business and administrative services to Total Vision, P.C., pursuant to a Business Services Agreement.

3.     Total Vision, P.C.'s optometry practices are independent practices— *i.e.*, wholly owned by a licensed ophthalmologist, and operated and controlled by licensed optometrists who provide services tailored to patients.   Patients receive treatment from optometrists employed by Total Vision, P.C. and order frames and lenses from Total Vision, P.C.   At all times, Total Vision, P.C.'s optometrists exercise their own independent medical judgment in treating patients.   These independent practices are the optometry equivalent of a family practice doctor; a place where a patient goes again and again for routine eye care and vision correction. Independent optometry practices are distinct from "corporate" optometry practices,

---

[1]     For the avoidance of doubt, all references to Total Vision's optometry practices or the provision of optometric goods or services refer solely to Total Vision, P.C.

2

which are not typically run by optometrists, are typically located in retail stores like Walmart or Costco, and primarily serve as vehicles to bring in customers so that they shop in the broader store.  If an independent optometry practice is like a family practice doctor, then a corporate optometry practice is like a Minute Clinic at a CVS; it serves a clientele looking for a different type of optometry practice, typically at a lower price, and with less comprehensive services.  For these reasons, independent optometry practices are more likely to attract patients with specialized needs (such as highly customized prescriptions) or "rich" vision insurance plans that provide more comprehensive coverage than other plans.  Corporate optometry practices, on the other hand, tend to attract customers that require only basic exams, have little or no insurance coverage, or are otherwise highly price sensitive.

4.     Defendant VSP Ventures  competes with Total Vision in bidding for the independent optometry practices that comprise Total Vision's network of optometrists.  The optometrists in Total Vision's network then compete with VSP's optometry practices (including those that VSP runs through Visionworks), and often wish to purchase products and services from parties other than VSP.  But VSP does not like that.  It wants to acquire Total Vision or, barring that, cap its (and similar competitors') growth so that VSP can eliminate its competition in bidding for independent optometry practices and become the dominant provider of optometry services in California, just as it is currently the dominant vision insurance provider. If optometry practice groups like Total Vision do not agree, then VSP threatens to run them into the ground—and it is now trying to do exactly that with Total Vision. By this lawsuit, Total Vision says enough is enough.

5.     VSP's course of dealing with Total Vision began in 2019, but its relationship with many of the independent optometrists whose practices together form Total Vision extends back decades.  Starting with a 2019 agreement ("2019 Retail Agreement"), VSP strong-armed Total Vision into anticompetitive tying

arrangements, which required Total Vision to purchase a substantial number of glasses frames and lenses manufactured and sold by VSP and exclusively use VSP's practice management software.  These provisions did not help Total Vision, its practices, or its patients.  Rather, they lined VSP's pockets with money siphoned away from patients and doctors by requiring Total Vision to use VSP's subsidiaries rather than other competitors that provide even better and/or lower-cost products and services, thereby limiting Total Vision's ability to go out and negotiate for the best prices and products available.  Indeed, as became clear later on, VSP's overall goal was to limit Total Vision's growth (or destroy it entirely)—just as VSP had done and continues to do with numerous other independent optometry practice networks.  Although Total Vision, P.C. is not a party to such agreements, Total Vision, P.C. must nonetheless comply with the terms to which VSP and Total Vision, LLC agreed in order to remain on VSP's network.

6.     VSP was able to foist these anticompetitive terms on Total Vision because it controls so much of the vision insurance market that companies like Total Vision have no choice but to acquiesce to its demands, lest they risk thousands of their patients losing access to vision insurance.  In fact, for years, VSP has threatened to do exactly that—remove Total Vision's ability to bill within VSP's insurance network—in order to extract increasingly painful and anticompetitive concessions from Total Vision.

7.     The repercussions of removing Total Vision's practices from VSP's insurance network would be severe.  It would make it difficult or impossible for thousands of existing patients to receive insurance coverage for optometry services, and it would effectively prevent Total Vision from acquiring or investing in any new independent    optometry    practices    within    VSP's    network. It would also needlessly disrupt the practices of many optometrists who have been

on VSP's network for decades, jeopardizing the care they provide to patients every day.

8.      VSP recognized this.  In late 2019, in an effort to force Total Vision into a new agreement that would limit Total Vision's growth, VSP threatened to terminate the parties' existing contract and kick Total Vision's providers off its network, even though their quality of care was top notch and many had been in VSP's network for years.  VSP also turned the screws on Total Vision by removing Total Vision practices (as well as other competitor practices) from VSP's "Premier" program, which prioritizes certain practices in the VSP insurance network and thus drives business to those practices.  VSP told Total Vision that the only way for Total Vision practices to remain on VSP's "Premier" program would be to allow VSP to invest in or acquire Total Vision.  Total Vision did not agree to this demand, so VSP eventually followed through on its most extreme threats and issued a termination notice.

9.      Chaos ensued.  VSP informed Total Vision on a Friday that all of Total Vision's doctors and patients were "off network" as of that day, resulting in widespread disruption of patient services.  Patients left Total Vision's practices in droves due to a lack of insurance coverage, and Total Vision had to scramble just to keep its practices running.  Facing the prospect of going out of business, Total Vision had no choice but to acquiesce to VSP's increasingly anticompetitive demands, which took the form of another retail agreement (the "2020 Agreement").  This agreement, like its predecessor, was riddled with anticompetitive terms and forced Total Vision to pay supracompetitive prices, purchase tied products from VSP, and otherwise submit to the unyielding power of a monopolist bent on expansion and profit at all costs.  In a remarkable admission of its anticompetitive aims, VSP revealed to Total Vision while negotiating the 2020 Agreement that VSP's goal was to "cap" Total Vision's growth.  But Total Vision had no choice but to submit.

10.     Although Total Vision was bullied into accepting a renewed agreement in September 2020—in which VSP was able to extract substantial concessions from Total Vision due to its threats—VSP continued its anticompetitive campaign.  In late 2022, VSP began touting its leverage over Total Vision while trying to convince Total Vision to sell itself to VSP, thereby adding another tentacle to VSP's growing empire.  It repeatedly noted that VSP—and VSP alone—had the power to choose to continue or to terminate the 2020 Agreement, and therefore to kick Total Vision's providers off its insurance network.  The threat was explicit:  sell yourself, or face the consequences.  At the same time, VSP dangled the prospect of renewal in front of Total Vision, in effect leading it on by creating the impression it was interested in good-faith discussions about continuing the agreement, rather than making termination a foregone conclusion.

11.     But in reality, VSP was never acting in good faith, and it never intended to renew the 2020 Agreement unless Total Vision agreed to sell its business to VSP on fire-sale terms.  When VSP made an offer to buy Total Vision on February 10, 2023, its bid and valuation were so substantially below Total Vision's reasonable valuation, as well as verbal indications it had received from other bidders, that it made no sense for Total Vision to continue negotiating a deal.  Total Vision reasonably declined and sought instead to discuss renewal of the 2020 Agreement. At that point, VSP stopped responding to Total Vision.

12.     Now, in retaliation for Total Vision rebuffing its lowball offer, VSP has finally followed through on its threats.  It has told Total Vision that, come September 2023, it will remove Total Vision from its network, threatening the future of Total Vision's business and causing substantial harm to Total Vision's patients and their relationships with their doctors.  VSP did not do this for any legitimate reason and, in fact, Total Vision and its constituent optometry practices had complied in all material respects with the parties' agreement.  Indeed, VSP would lose a huge

6

amount of short-term profits doing so. Nor was termination necessary or inevitable; rather, VSP itself had created the impression that it was interested in potentially renewing the Agreement, and changed course only when Total Vision declined to sell its business at a bargain-basement price.

13.    The benefit to VSP from this anticompetitive strategy is in the long term. Its decision to terminate Total Vision is a naked attempt to try and run Total Vision into the ground so that it either fails (thereby increasing VSP's profits and market share in California by eliminating a whole series of competitive independent optometry practices) or so VSP can purchase it at a fire-sale price (thereby increasing VSP's profits and growing its market share by swallowing up yet another competitor). Either way, taking Total Vision "off network" will make it extremely difficult, if not impossible, for Total Vision to grow in competition with VSP, because most independent optometry practices in the state rely on VSP's insurance services and cannot get crosswise with VSP due to the damage it can cause by taking them off network. As one optometrist in Total Vision's network put it, they would have sold to VSP Ventures, rather than Total Vision, had they known that Total Vision would not be in VSP's network. VSP's renewed threat, if followed through, thus risks making good on its longstanding desire to cap Total Vision's growth.

14.    Moreover, as Total Vision understands, VSP's practices are not confined to it alone. These practices are widespread and affect any competitor in the independent optometry market with the gall to stand up to the ever-growing monopolist by growing their optometry presence while VSP seeks to dominate that space.

15.    The antitrust laws do not countenance such flagrantly anticompetitive conduct. Total Vision thus brings this action seeking injunctive relief and damages.

## THE PARTIES

16.     Plaintiff Total Vision, LLC is a Delaware limited liability corporation with its principal place of business in Irvine, California.

17.     Plaintiff Total Vision, P.C. is a California professional corporation with its principal place of business in San Diego, California.

18.     Defendant VSP is a California corporation with its principal place of business in Rancho Cordova, California.

19.     Defendant Visionworks, a subsidiary of VSP, is a Texas corporation with its principal place of business in San Antonio, TX.

20.     Defendant VSP Ventures, a subsidiary of VSP, is a Delaware limited liability corporation with its principal place of  business in Rancho Cordova, California.

21.     Defendant Altair, a subsidiary of VSP, is a California corporation with its principal place of business in Rancho Cordova, California.

22.     Defendant Marchon, a subsidiary of VSP, is a New York corporation with its principal place of business in Melville, New York,

23.     Defendant Eyefinity, a subsidiary of VSP, is a Delaware corporation with its principal place of business in Rancho Cordova, California.

24.     Defendant Plexus, a subsidiary of VSP, is a Delaware corporation with its principal place of  business in Rancho Cordova, California.

25.     Defendant VSPOne, a subsidiary of VSP, is a Delaware corporation with its principal place of business in Rancho Cordova, California.

26.     Defendant Eyeconic, a subsidiary of VSP, is a California corporation with its principal place of business in Rancho Cordova, California.

**JURISDICTION AND VENUE**

27.     Total Vision seeks injunctive relief for and to recover damages caused by VSP's violations of the Sherman Act, 15 U.S.C. §§ 1, 2, as well as California's Unfair Trade Practices Act.

28.     The Court has subject matter jurisdiction over this action, pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4; 28 U.S.C. § 1337; and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

29.     Venue and personal jurisdiction over Defendants are proper in this District under 28 U.S.C. § 1391, because Defendants transact business and are found within this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred within this District.

**FACTUAL BACKGROUND**

**A.     TOTAL VISION AND VSP**

30.     *Total Vision*:  Total Vision, P.C., a California business based in San Diego, owns and operates an optometry practice that, through the independent optometrists whose practices it acquires, provides patient care.  Total Vision, LLC is a business headquartered in Mission Viejo, California that provides nonclinical business support services to Total Vision, P.C. pursuant to a Business Services Agreement between Total Vision, LLC and Total Vision, P.C.  By centralizing and pooling nonclinical back-office and administrative functions, while preserving all clinical functions under the exclusive control of a professional corporation solely owned by a physician and controlled by optometrist leaders, Total Vision allows the optometrists at Total-Vision-supported practices to focus on patient care.

31.     This provides significant value for optometry practices.  Under California law, a single optometry practice owned by one or more optometrists can have no more than 11 locations.  Cal. Bus. & Prof. Code § 3077(b).  In order to form a larger group that can better compete in the marketplace without violating this

limitation, optometrists must pool their nonclinical assets into a management company, such as Total Vision, which then supports the optometry practices. The management company, however, agrees not to interfere with the independent control or medical judgment of the licensed clinical personnel. Thus, by consolidating non-clinical functions while preserving the independent clinical ownership and control of the optometry practices, Total Vision creates economies of scale that all of the supported optometry practices can leverage and allows them to devote their time and resources to caring for patients.

32. As a result of the support that Total Vision, LLC provides, Total Vision, P.C.'s optometry practices can spend more time helping patients by conducting eye exams, diagnosing diseases, and providing critical products like glasses and contact lenses. This also promotes competition, by ensuring that these independent practices can keep costs down and prioritize patient care, creating more options and lower prices for patients.

33. Currently, Total Vision, LLC supports 59 independent optometry practice locations, all located in California and owned and operated by Total Vision, P.C. In accordance with California law, the practices are all owned by Total Vision, P.C., which is solely owned by a licensed ophthalmologist and whose officers are solely licensed physicians or optometrists. In addition, most if not all of the lead optometrists for each location are direct or indirect equity holders in Total Vision, LLC.

34. *VSP*: VSP was originally founded as a non-profit vision insurer. However, its non-profit status was revoked by the Internal Revenue Service ("IRS") in 2003—a determination that was later upheld on appeal by the Ninth Circuit Court of Appeals.

35. For many decades, VSP has been the country's dominant vision insurer, a business that it now operates through its VSP Vision Care business unit.

36.     VSP has also aggressively entered related businesses, including those for eyewear, lenses, practice management software, optical labs, retail optometry, and a consolidator of independent optometry practices.  In 1992, for example, VSP founded Defendant Altair.  It followed this in 2008 with the $735 million acquisition of Defendant Marchon.  Through its ownership of Altair and Marchon, VSP licenses the rights to and sells glasses designed by household brands such as Calvin Klein, Cole Haan, Nautica, Nike, and Ferragamo, among numerous other brands.

37.     VSP also owns the Unity lenses brand, which, according to VSP's website, is "the fastest growing lens brand in the industry."  In 2011, VSP launched Eyeconic as an online contact lenses retailer.

38.     In addition, VSP owns Eyefinity, which provides practice management software to optometrists, and VSPOne, a network of optical laboratories.  Moreover, in 2019, VSP acquired Visionworks, which operates over 700 independent optometry locations across more than 40 states and also launched VSP Ventures to acquire additional independent optometry practices.  More recently, VSP Ventures and Total Vision have gone head-to-head in bidding for independent optometry practices in California.

39.     As a result of this massive expansion in its business, VSP has achieved significant vertical integration by combining its insurance business with other eyewear-related products and services.  As one source noted, this has granted VSP "control of the entire chain of vision care production."[2]

40.     Due to VSP's size and dominance, being removed from VSP's provider network would be devastating to most California-based independent optometry practices.  VSP is the largest vision insurer in California with market share that exceeds its national market share.  Thus, if an independent optometry practice is not

---

[2]     Optometry Times, *The Vision Care Plan Industry's Vertical Monopoly* (Oct. 27, 2014), https://www.optometrytimes.com/view/vision-care-plan-industrys-vertical-monopoly.

11

covered by VSP, most of its patients will be unable to use their in-network benefits, jeopardizing their ability to pay out-of-pocket for eye exams, eyewear, and other related products and services.  And others will only be able to use their insurance by jumping through various hurdles, making it less likely they will continue using that optometry practice, as opposed to a practice that is in VSP's network.  Moreover, losing access to VSP's provider network would drive away new patients who carry VSP's insurance, as such patients are unlikely to visit an optometrist that does not take their insurance.  And VSP-insured patients account for over 50% of revenue for practices under Total Vision's contract, as is the case with most other independently owned optometry practices in California.  Overall, being on VSP's network remains vitally necessary for independent optometry practices like Total Vision, and being removed from VSP's provider network threatens to render an out-of-network independent optometry practice's business stagnant and unprofitable.

## B.  VSP'S POWER IN THE VISION INSURANCE MARKET

41.  VSP has both monopoly and market power over vision insurance.  In fact, VSP has been the nation's largest and most dominant vision insurer for decades.  To this point, the Department of Justice's Antitrust Division noted VSP's monopoly power in the market for vision insurance as early as the 1990s.  In 1994, the DOJ brought suit against VSP to halt VSP's anticompetitive practices, because they led to supracompetitive pricing in the provision of optometry services.

42.  The DOJ's allegations made clear that, even as far back as the mid-1990s, VSP wielded monopoly power through its ability to exclude competitors and maintain supracompetitive pricing.  The DOJ's suit aimed to halt VSP's practice of including most-favored-nation clauses in its agreements with optometrists, which required that each doctor charge VSP no more than the lowest price they charged any non-VSP patient or vision care group or insurance plan.  Because of VSP's dominant insurance network, its most-favored-nation agreements, which effectively

prevented optometrists from working with other insurance companies that provided lower rates, made it impossible for other insurers to compete and left optometrists with little incentive to contract with other insurers, harming competition.  As the DOJ explained, "[b]ecause in all or parts of many states in which the Defendant does business, a relatively large percentage of optometrists in private practice are VSP panel doctors, and because revenue from serving the patients covered by VSP plans is a significant portion of many of those panel doctors' professional income…the Defendant's [conduct] has resulted in many competing vision care insurance plans being unable to attract or retain sufficient numbers of panel doctors to serve their members." *See* Complaint at ¶ 11, *United States v. Vision Serv. Plan*, 94-CV-2692 (D.D.C. Dec. 15, 1994).

43.    VSP settled the claims brought by the DOJ, and the settlement was memorialized in a consent judgment.  According to the Competitive Impact Statement filed with the consent judgment, by restricting optometrists' freedom to enter into discounting arrangements with alternative plans, VSP "severely hampered competing vision care insurance plans' efforts to attract or retain, at competitive prices, a sufficient, geographically dispersed panel of qualified optometrists to make their plans commercially marketable." *United States v. Vision Serv. Plan*, 1996 WL 351147, at *7 (D.D.C. Apr. 12, 1996) (Revised Competitive Impact Statement).  As the Statement described, VSP's anticompetitive conduct harmed patients by depriving them of the "benefits of free and open competition." *Id.*

44.    The Competitive Impact Statement further explained that VSP had been able to exclude competitors due to its stranglehold over the vision insurance market: "Since many VSP panel doctors in all or parts of many states receive a significant portion of their professional income from treating VSP patients, they…are unwilling to drop their participation in VSP." *See id.* at *6.  In California, for example, VSP contracted with "approximately 4,000 panel doctors, constituting about 90% of

California optometrists in independent private practice" and covered "over 5.7 million members accounting for total annual revenue of approximately $200 million." *Id.* at *5.

45.    Since then, VSP's power over vision insurance has only grown.  In California, VSP currently holds a majority share of the vision insurance market.  For example, patients insured by VSP comprised 62% of total 2022 exams and 66% of exams to patients with insurance in 2022 at Total Vision optometry practices.

46.    The next highest payor, EyeMed, accounts for only about 14% of those patients.  Even these numbers understate the importance of being in-network with VSP.  Total Vision's calculations indicate that going off-network with VSP will cause it to lose approximately 25% of its patients overnight and continue to hemorrhage clients as their next optometry appointments come up.  Equally as important, Total Vision practices will lose a critical pipeline for new patients, which is the lifeblood of independent optometry practices, and Total Vision calculates that they will wither on the vine before succumbing to due to lack of profitability and growth.  Based on its market research and discussions, Total Vision understands that its practices are generally representative of California at large, confirming that being off-network with VSP would (and does) have the same effect on non-Total Vision optometry practices.

47.    Further underscoring VSP's power in vision insurance is that the vast majority of the top employers in California—including the State of California, University of California, Wells Fargo, the Walt Disney Company, and Oracle, amongst others—use VSP as their vision insurance provider.

48.    VSP's monopoly power is not limited to California; it is national. About 48.5% of Americans—or approximately 126.8 million—have vision

insurance.[3]  With more than 82 million members in its network, VSP's share of patients with vision insurance nationally approaches 65%.[4]  VSP's share of the fully-insured vision insurance market is an even higher 70%.[5]  VSP also has by far the highest market share of vision-only insurance plans (67%)—more than *three-and-a-half* times that of the next largest competitor, Blue Cross Blue Shield.[6]

49.     These numbers actually understate VSP's market share, because they include exams at corporate optometry practices, for which being "in-network" is not critical because such optometry practices are loss leaders for the retail stores in which they operate; *i.e.*, their profitability is largely irrelevant to the corporation running them, because their primary purpose is to bring consumers into the store.  In contrast, it is absolutely critical for independent optometry practices to be "in-network" to survive, particularly (as discussed below) in-network with VSP.  Thus, VSP's market share with respect to independent optometry practices is likely even higher.

50.     There are also significant barriers to new entry for any entity wanting to offer vision insurance.  For example, any company offering vision insurance must comply with federal regulations as well as state-level regulations in any state in which it operates; expend significant start-up costs; deal with complex back-office issues related to reimbursement; and ensure that it services a wide enough pool of patients to avoid adverse selection—*i.e.*, the risk that only patients needing services

---

[3]  The Vision Counsel, *The Vision Counsel Releases Visionwatch Q4 2021 Market Research Reports* (Mar. 9, 2022), https://thevisioncouncil.org/blog/vision-council-releases-visionwatch-q4-2021-market-research-reports.

[4]  VSP, *About VSP*, https://www.vsp.com/about-vsp.

[5]  Mark Farrah Associates, *Highly-Concentrated Vision Insurance Market Increasing* (Jan. 12, 2023), https://www.markfarrah.com/mfa-briefs/highly-concentrated-vision-insurance-market-increasing/.

[6]  Stephanie Guinan, *What Are the Largest Vision Insurance Companies?*, VALUEPENGUIN (Jul. 6, 2023), https://www.valuepenguin.com/health-insurance/largest-vision-insurance-companies.

15

that exceed the cost of their premiums purchase insurance. Moreover, any new insurance provider must compete with established incumbents like VSP, which is extremely difficult in a complex, heavily regulated industry in which millions of Americans already have vision insurance, either by paying for it themselves or through their employer.

51.     The threat VSP's power poses to healthy competition has not gone unnoticed. On August 8, 2023, the House Committee on Oversight and Accountability called on Federal Trade Commission (FTC) Chair Lina Khan to schedule a staff-level briefing and produce information relating to the anticompetitive effects of consolidation of vision insurance plans and their vertical integration with manufacturers, citing "serious concerns about the potential for increased costs to consumers."[7] The Committee singled VSP out as the one company that controlled more than 75% of the standalone vision insurance plan market in 28 states.[8] In addition, VSP controls at least a plurality of the vision insurance plan market in 37 states and Washington, D.C.[9]

52.     VSP does not just have a high market share, it also has considerable market power. To illustrate, in the first quarter of 2023, VSP alone accounted for ***over 50%*** of Total Vision's revenue—more than three times the next largest carrier. This is also the case with most other independent optometry practices in California. Because VSP commands such a large share of the market for vision insurance, as noted above, any independent optometry practice that loses access to VSP's network risks immediately losing many of its patients and then losing a steady stream of

---

[7]     Letter from the United States House of Representatives Committee on Oversight and Accountability to FTC Chair Lina Khan (Aug. 8, 2023), https://oversight.house.gov/wp-content/uploads/2023/08/Letter-to-FTC-Khan-on-Consolidation-of-Vision-Care-Plans.pdf.

[8]     *Id.*

[9]     Guinan, *supra* note 6.

additional patients over the ensuing months and years, as those patients may not be able to receive insurance coverage for their optometry services or see the optometrist of their choice.

53.    VSP's expansion into independent optometry only enhances its dominance.  Since VSP Ventures launched in 2019, it has acquired at least 84 independent optometry practices throughout the United States.[10]  By ensuring that only VSP practices can have access to the benefits of being on VSP's network, as further described below, VSP has effectively ensured that independent optometrists will choose to join VSP's network of independent optometrists rather than Total Vision—regardless of which company offers the highest bid.  Indeed, at least one optometrist who sold their practice to Total Vision admitted that they would have instead sold their practice to VSP had they known that Total Vision would no longer be on VSP's network.  VSP thus limits the ability of competitors like Total Vision to acquire new practices while also using the leverage its power in the insurance market provides to stymie their growth.

54.    All of this gives VSP enormous leverage over independent optometry practices, and has allowed it to engage in a bevy of anticompetitive actions over the past few decades.  Most recently, VSP's unlawful actions have targeted Total Vision.

## VSP'S ANTICOMPETITIVE ACTS

A.    **VSP FORCES TOTAL VISION, LLC TO ENTER AN ANTICOMPETITIVE RETAIL AGREEMENT**

55.    In late 2017, prior to forming Total Vision, its founding optometrists and businesspeople approached VSP to initiate a positive relationship because VSP's provision of insurance is essential to their business.  To facilitate their relationship,

---

[10] VISION MONDAY, *VSP Ventures Acquires Five Southern California Practices* (Apr. 12, 2023), https://www.visionmonday.com/eyecare/article/vsp-ventures-acquires-five-southern-california-practices/.

in January 2018, Total Vision provided written responses to VSP's questions, and by December 2018, Total Vision, LLC and VSP began discussions surrounding what ultimately became the first Retail Agreement between VSP and Total Vision, LLC. Meanwhile, in 2019, during these discussions, VSP affirmatively assured independent optometrists that they could join Total Vision's network, to ease their concerns about losing access to VSP.

56.     On May 22, 2019, Total Vision, LLC and VSP entered into the 2019 Retail Agreement, which provided the terms for the business arrangement between Total Vision and VSP, and addressed, for example, payment and claim transmission. Crucial from Total Vision's perspective—and in line with its expectations based on the 2018-19 discussions and the practices' decades-long status as VSP in-network providers—the 2019 Retail Agreement provided for the automatic renewal of one-year terms.  These automatic renewals were important to ensure that Total Vision did not lose access to VSP's network from year-to-year.

57.     At the same time, due to VSP's dominance in the vision insurance market and market for independent optometry practices, as well as the economic necessity for Total Vision to accommodate VSP-insured patients, VSP forced a number of harmful terms on Total Vision, LLC, and ultimately on Total Vision, P.C., which benefited VSP alone, while harming competition and reducing consumer choice.  As one example, the 2019 Retail Agreement contained a term purporting to allow VSP to deny coverage to optometry practices acquired by Total Vision under certain circumstances—something that effectively allowed VSP to limit Total Vision's growth.

58.     It also included the following anticompetitive provisions:

59.     ***Limitation on Market Share***:  The 2019 Retail Agreement sought to limit Total Vision's growth by allowing VSP to deny coverage to any new optometry practice that Total Vision acquired if VSP determined that adding the new practice

would increase Total Vision's market penetration in any metropolitan service area above 30%. This was nothing more than an attempt to prevent Total Vision from growing its market share, so that VSP could ensure that VSP and VSP's subsidiaries maintained their own market share. Because this requirement appeared to stem from VSP's form retail contract, VSP has presumably imposed similar anticompetitive market share limits on other optometry practices as well.

60. **_Marchon and Altair Frames_**: VSP made Total Vision, LLC agree to "use commercially reasonable efforts to purchase, through [its] Optometry Practices, an average of $35,000 in Marchon and Altair frames per Optometry Practice per year" and "work with [VSP] on a plan to purchase an average of $45,000-$50,000 per Optometry Practice, or to dedicate approximately 50% of each Optometry Practice's board space to Marchon and Altair frames." This provision harmed Total Vision, because Marchon and Altair frames net, per unit, 10.3% less revenue per unit and 8.5% less gross profit per unit than other frames. Making matters worse, VSP artificially lowered reimbursement rates for brands that it owned as compared to other brands.

61. This provision harmed competition too, because—unbeknownst to patients—it unfairly stacked the deck in favor of VSP's Marchon and Altair frames. It also hurt consumers, by depriving anyone who needed glasses of more options for and price competition among glasses frames and interfering with optometrists' freedom to recommend the best frame choices to particular patients. Moreover, because different facial structures have different frame requirements for optimal visual correction and ergonomics, restrictive terms such as these may unfairly disadvantage patient communities who require a wider range of frame options, including much cheaper options.

62. **_Unity Lenses_**: VSP also required Total Vision, LLC to "use commercially reasonable efforts to ensure at least fifty percent (50%) of the lenses

19

purchased by each Optometry Practice for [VSP-insured patients] are Unity lenses, in a market-reflective mix [] (the 'Unity Criteria')." This provision harmed Total Vision because Unity lenses are on average **56.8% more expensive** than Essilor lenses, another brand of lenses available to Total Vision.

63.     Moreover, the Unity lenses provision harmed patients, because Unity lenses are not comparable in quality to Essilor's top tier lens, a product called "Varilux X," which is known as the "Mercedes Benz" of lenses. Essilor's Varilux X lenses eliminate the need to tilt one's head to see different distances, whereas Unity does not offer a product with the same technology. And the Unity lenses provision makes it demonstrably harder for consumers to buy Varilux X lenses.

64.     Even beyond that, older versions of Unity lenses in particular created problems for patients who were pushed to switch to Unity lenses but were unable to physically adapt to the change in lens technology. This frequently required Total Vision to completely redo patients' eyeglasses, reducing the quality of services patients received and harming Total Vision's business.

65.     **VSPOne Labs**:  Total Vision, LLC also agreed to "use commercially reasonable efforts to ensure its Optometry Practices use only VSPOne Labs." This provision impaired Total Vision's ability to utilize other optical labs for their lens treatment and coating capabilities, to the detriment of open competition and consumer choice among different optical labs.

66.     **Eyefinity**:  Total Vision, LLC agreed to "use commercially reasonable efforts to establish Eyefinity practice management and electronic health record solutions as its exclusive platform and to cause every Optometry Practice…to utilize an Eyefinity solution." This required Total Vision providers to use Eyefinity for no reason other than its status as a VSP subsidiary, and for a core part of their business—that is, for all of their electronic patientcare processes, from the entry and storage of confidential patient information to the scheduling of appointments and

billing.  Once entrenched, migrating a practice's entire patient database and other systemwide information to a different service platform is extremely difficult.  As such, this term limited providers' freedom to switch to competing practice management and health record solution systems that could enhance practice efficiency, better protect client data, or lower costs.

67.    ***Change of Control***:  VSP also made Total Vision, LLC agree to a provision requiring VSP's consent for "[a]ny change in control of [Total Vision]." The term further warned that VSP had "no obligation to consent in its sole and absolute discretion to such change in ownership or control or such sale or transfer of assets if such sale or transfer is made to any competitor of any of the VSP Global companies."

68.    This change-of-control provision had no procompetitive rationale and was instead nothing more than a gambit to ensure that VSP could maintain leverage over Total Vision and opportunistically renegotiate material business terms in the event Total Vision sought to sell its increasingly profitable business.

69.    Although Total Vision, P.C. was not a party to the 2019 Retail Agreement, its provisions directly and negatively impacted Total Vision, P.C. because, as explained herein, Total Vision, P.C. had no choice but to comply, lest it risk losing access to VSP's insurance network.

70.    Total Vision, LLC would not have accepted any of these terms if it did not need to ensure its providers remained in VSP's insurance network.  Although each of the above provisions is problematic on its own, their cumulative impact is even worse.  Together, and in the context of VSP's monopoly power, they deprive consumers of more and better alternatives, limit their choices to options that are generally higher-priced for equivalent or worse quality, and harm the patient experience.

71.     The terms VSP insisted that Total Vision, LLC accept have no procompetitive rationale with respect to the provision of vision insurance, the subject of the Retail Agreement.  Nor do they promote competition with respect to products such as frames and lenses.  To the contrary, they undermine competition by stacking the deck in favor of VSP's products and services while making it harder for consumers to obtain competing services and driving up costs. Indeed, as the American Optometric Association ("AOA") put it: "Under [VSP's] new policy, doctors' choice in products for patients will be limited based on what's in the best interest of VSP rather than what's in the best interest of the patient."[11]

## B.     VSP SHORES UP ITS MONOPOLY AND MARKET POWER BY ENTERING THE INDEPENDENT OPTOMETRY MARKET AND ACQUIRING INDEPENDENT OPTOMETRY PRACTICES

72.     In 2019, VSP took a significant step towards achieving complete vertical control over vision care by opening brick-and-mortar retail optometry locations and acquiring previously independent optometry practices.  Specifically, VSP opened Eyeconic locations to sell contact lenses and eyewear and provide optometry services such as eye exams. At the same time, VSP had additional plans to expand its physical presence in the independent optometry market.

73.     Moreover, in or around March 2019, VSP launched a business unit called VSP Ventures in order to acquire independent optometry practices, thereby becoming a direct competitor of Total Vision and all other independent optometry practices in the state.  VSP Ventures has acquired at least twelve previously independent practices in California since then, including five in May 2023, and VSP Ventures has bid directly against Total Vision for independent optometry practices

---

[11]   VISION MONDAY, *Upcoming #AskAOA Webinar to Examine 'Vision Plan Policies That Restrict, Undervalue Care'* (Aug. 7, 2020), https://www.visionmonday.com/latest-news/article/upcoming-askaoa-webinar-to-examine-vision-plan-policies-that-restrict-undervalue-care.

in California.  Under VSP's acquisition model, optometrists who sell practices to VSP Ventures become employees of a professional corporation supported by VSP Ventures, but do not become co-owners of VSP Ventures.  This differs from Total Vision's model, where all sellers who are actively practicing gain equity in/join as co-owners of Total Vision, P.C.

74.   Once VSP follows through with its threat and kicks Total Vision practices off its network, the independent practices for which Total Vision and VSP Ventures compete will face enormous pressure to sell to VSP Ventures—even if that means doing so for a lower price or on less preferable terms.  Otherwise, they face the prospect of losing access to VSP's network, which is not an option for independent optometry practices, given that they must remain on VSP's network to stay economically viable.  Confirming as much, since announcing that Total Vision is being kicked off of VSP's network, at least one doctor has expressed that they would have sold their practice to VSP Ventures rather than Total Vision had they known Total Vision would later be kicked off  VSP's network.

75.   As the United States House Committee on Oversight and Accountability noted in its August 8, 2023 letter to FTC Chair Lina Khan, vertical integration of brick-and-mortar optometry retail and vision insurance has allowed insurers like VSP to "mark up prices by as much as 1,000 percent."[12]  That letter expressed significant concerns about VSP and asked the FTC to schedule a briefing with the Committee to discuss those practices "to ensure the consolidation in the vision care market does not detrimentally impact consumers."[13]

76.   Around the time that VSP entered the market for independent optometry, it announced on its website that this development altered its willingness

---

[12]   Letter from the United States House of Representatives Committee on Oversight and Accountability, *supra* note 7.

[13]   *Id.*

to deal with groups of optometry practices, like Total Vision.  In mid-2019, VSP explained that based on an assessment of the scope of its provider network and its recent retail strategy announcement, effective April 15, 2019, VSP would place a hold on any new network arrangements with private equity or similar backed groups.

77.   In October 2019, VSP announced the acquisition of Visionworks, marking VSP Global's largest network investment.  Visionworks operates over 700 brick-and-mortar retail optometry locations in over 40 states.  At the time of the acquisition, it was the sixth largest provider of optometry goods and services in the United States through its retail locations.  VSP's Visionworks acquisition catapulted it to prominence in the retail optometry market.  As one source noted: "The Visionworks deal…creates a near-national footprint with one purchase."[14]

78.   By December 2021, VSP's Visionworks was the seventh largest optical retailer in the United States, with $1.14 billion in sales across 716 locations—right behind Costco.  Due to what appears to be a recent push to expand into California, VSP now owns 50 California practices, 29 of which are within 20 miles of a Total Vision practice, and it continues to grow its retail practice.

## C.   VSP PRESSURES TOTAL VISION TO LIMIT ITS GROWTH AND THREATENS FINANCIAL RUIN IF IT DOES NOT

79.   In November 2019, VSP informed Total Vision that it intended to remove Total Vision practices from VSP's "Premier" program.  VSP followed through on its threat in January 2020.

80.   Practices in VSP's "Premier" program are tagged with a "Premier" banner when patients search for in-network providers on VSP's website, and therefore patients are more likely to frequent practices with "Premier" status.

---

[14]   Adam Blair, RETAIL TOUCHPOINTS, *VSP Global Acquires 700-Store Visionworks Chain* (Oct. 1, 2019), https://www.retailtouchpoints.com/features/mergers-and-acquisitions/vsp-global-acquires-700-store-visionworks-chain.

According to VSP's website, the benefits of being on the "Premier" program include, among other things, "more savings, more traffic to your practice, more exclusive patient offers" and "[e]xclusive partnerships with industry-leading companies."[15]  Many of Total Vision practices had "Premier" status before VSP became a competitor to Total Vision in 2019, but all were summarily removed at the beginning of 2020.

81.   When Total Vision asked VSP why it had removed Total Vision practices from the "Premier" program, VSP claimed that it was removing all practices supported by a non-doctor-owned company from its "Premier" program. This was plainly pretextual: since Total Vision, P.C. practices and doctors hold equity in Total Vision, they effectively own Total Vision.  Proving as much, when questioned as to whether it was also removing Visionworks locations from the Premier program, VSP responded that it was not, because VSP owns Visionworks. In addition, VSP has bent its own rule to allow other PE-backed groups on its network in areas where they have less retail presence—confirming that VSP's removal of Total Vision from its network had less to do with its stated rationale and more to do with how VSP saw Total Vision as a threat to its retail growth.

82.   VSP stated to Total Vision that the only way for Total Vision to remain on VSP's Premier program would be for VSP to acquire or invest in Total Vision.

83.   Things only got worse after that.  On February 26, 2020, VSP sent Total Vision a notice of termination of the 2019 Retail Agreement (which otherwise would have renewed automatically).  The notice stated:  "[a]s a formality, [VSP is] putting [Total Vision] on notice that the Retail Agreement, with its current commercial requirements, is being terminated."  The letter continued, "[h]owever, in reality, [VSP] intend[s] to continue our relationship with Total Vision while we work with

---

[15]  VSP Provider Hub, *Frequently Asked Questions*, https://www.vspproviderhub.com/faqs.html.

you to establish new terms," and "[w]hen those new terms are established, VSP will most likely simply issue an amendment to the Retail Agreement." That same day, VSP informed Total Vision by phone that it wanted the amended Retail Agreement to incorporate an agreement to limit Total Vision's ability to grow in the future.

84.    Left with no other options, Total Vision, LLC continued to negotiate with VSP. Through the spring of 2020, VSP and Total Vision, LLC corresponded regarding a potential amendment to the Retail Agreement. In early April, during a conference call between VSP and Total Vision, LLC, VSP reiterated that one of the new terms it would insist upon was an agreement to limit Total Vision's growth.

85.    On April 13, 2020, VSP sent Total Vision, LLC a meeting invitation, which included an agenda of "Next step discussion points"—the first of which was baldly listed as "***Capping Location Growth***." When Total Vision, LLC objected to VSP's insistence on capping Total Vision's growth, VSP reverted in late April with an offer to allow Total Vision to add another fifteen practices that would remain on VSP's insurance network, but still insisted on a cap of Total Vision's growth. On May 15, 2020, VSP and Total Vision, LLC held a conference call with their respective attorneys, during which Total Vision, LLC explained that VSP's demand to "Cap[] Location Growth" amounted to a demand that Total Vision not grow beyond VSP's preferred limits, so that VSP could continue its path to dominance in the optometry practice space in California.

86.    VSP responded by retaliating against Total Vision. On June 11, 2020, VSP informed Total Vision, LLC that VSP would renew the Retail Agreement for one year, subject to a cap of 15 additional Total Vision practices, but that all of Total Vision's practices would be removed from VSP's insurance network after the proposed one-year renewal. This offer only postponed the harm to Total Vision, however. Throughout June and July 2020, Total Vision, LLC made persistent good-faith efforts to convince VSP to agree to terms that did not run afoul of the antitrust

laws, but VSP refused to budge.   VSP continued to insist on "Capping [Total Vision's] Growth."

87.   During a conference call held on August 4, 2020, Lisa Fields, VSP's Deputy General Counsel, repeated twice that VSP's intention was to "cap" Total Vision's growth, and that this was contemplated "as part of [VSP's] new business model"—in other words, by VSP's status as a horizontal competitor to Total Vision. VSP further laid bare its intent by once again informing Total Vision that Total Vision could avoid all these issues by selling itself to VSP.

88.   Following the August 4, 2020 call, Total Vision, LLC sent a revised proposed amended Retail Agreement to VSP.   Two days later, VSP responded by informing Total Vision, LLC that VSP would immediately remove all of Total Vision's supported practices from VSP's provider network.

89.   VSP followed through on its threats.   On Friday, August 7, 2020, it called Total Vision, LLC and informed it that Total Vision practices were being taken off network, causing widespread chaos at Total Vision's practices.   The next Monday, on August 10, 2020, VSP informed Total Vision practices in writing that "[b]ecause of your affiliation with Total Vision…we must inform you that you and your practice are no longer eligible to participate on, and will be removed from, the VSP doctor network."   VSP also contacted Total Vision patients directly to inform them that Total Vision is no longer "in-network" with VSP, discouraging patients from continuing to patronize Total Vision and instead take their business elsewhere (no doubt to VSP-affiliated purveyors).   VSP then made good on its threat on August 17, 2020.

90.   The effect of VSP's termination threat on patients and providers was immediate and hugely disruptive.   Total Vision providers, many of whom had been covered by VSP for years (even decades) and had no reason to expect otherwise,

were suddenly forced to scramble to find alternate coverage and arrangements for their patients.

91.     Patients, too, faced unnecessary and unjustifiable disruptions to their service.  With close to no notice, they were forced to either pay out of pocket to continue visiting their trusted providers or migrate their prescriptions to practices that were less convenient or otherwise not their preferred choice.  Many patients chose to leave Total Vision's practices due to the lack of in-network benefits.

92.     The prospect of sudden termination was also disruptive for Total Vision because, at the time, Total Vision was in the process of negotiating agreements with 41 independent optometry practices that were seeking to join Total Vision's network.  This includes eight practices that had signed letters of intent to join Total Vision, three practices to whom Total Vision had sent letters of intent, and another 30 practices who had signed non-disclosure agreements to facilitate data sharing and negotiation between those practices and Total Vision.

93.     VSP was well aware of Total Vision's prospective relationships with these 41 practices, including because Total Vision had discussed them multiple times with VSP during Total Vision's negotiations with VSP.

94.     Armed with this knowledge, VSP still insisted on "capping" Total Vision's growth, though it knew that no practice would even consider joining Total Vision if it knew it would be kicked out of VSP's monopoly vision insurance network as a result.

95.     And, of course, VSP's threatened caps did interfere with Total Vision's negotiations with these practices.  As a result of VSP's monopolistic tactics, Total Vision lost out on the opportunity to grow its business by at least 117 percent—and likely more, had VSP not cast a shadow over the prospect of dealing with Total Vision.

**D. VSP COERCES TOTAL VISION, LLC INTO A RENEWED RETAIL AGREEMENT THAT UNREASONABLY RESTRAINS COMPETITION**

96.    Despite VSP's threats, Total Vision, LLC remained willing to return to the bargaining table to avoid jeopardizing its practices' and patients' access to VSP's insurance network.  After multiple rounds of discussion, on September 29, 2020, Total Vision, LLC and VSP entered into a renewed agreement for a three-year term (the "2020 Agreement").  This agreement again contained multiple anticompetitive terms that accrued to the benefit of VSP and its subsidiaries alone, while harming competition, Total Vision, and its patients:

97.    *Limitation on Market Share*:  Like the 2019 Retail Agreement, the 2020 Agreement restricted Total Vision's growth, this time, capping the total number of locations Total Vision was allowed at 70.  In addition, the 2020 Agreement provided that VSP could in its sole and absolute discretion deny applications by optometry practices previously affiliated with a Retail-Commercial Chain.

98.    *Marchon and Altair Frames*:  VSP again made Total Vision, LLC agree that it "shall use commercially reasonable efforts to purchase, through [its] Optometry Practices, an average of $35,000 in Marchon and Altair frames per Optometry Practice per year and shall work with [VSP] on a plan to purchase an average of $45,000-$50,000 per Optometry Practice, or to dedicate approximately 50% of each Optometry Practice's board space to Marchon and Altair frames." Notwithstanding the difficulties of complying with this provision, Total Vision has done so.

99.    *Unity Lenses*:  VSP also again required Total Vision, LLC to "use commercially reasonable efforts to ensure at least fifty percent (50%) of the lenses purchased by each Optometry Practice for [VSP-insured patients] are Unity lenses, in a market-reflective mix [] (the 'Unity Criteria')."  This time, however, VSP

insisted on adding teeth to the provision, including that "in the event [Total Vision] fails to achieve the Unity Criteria in any quarter…[VSP] will invoice [Total Vision] for the shortfall at the rate of Forty Dollars ($40) per pair."

100. ***Eyefinity***: Total Vision, LLC also again agreed to "use commercially reasonable efforts to establish Eyefinity practice management and electronic health record solutions as its exclusive platform and to cause every Optometry Practice…to utilize an Eyefinity solution." Again, Total Vision complied.

101. ***Reduced Rebates***: VSP made Total Vision, LLC agree that Total Vision providers would no longer be able to participate in VSP's Premier Program (and its associated discount and savings programs) unless VSP in its sole and absolute discretion consented otherwise. As a result of this provision, several unaffiliated sites that were previously designated "Premier" lost this status upon joining Total Vision—a thinly veiled warning to independent providers not to associate with VSP's competitors if they wished to avoid VSP's retaliation. VSP also placed Total Vision doctors on a fee schedule with significantly reduced reimbursement rates. These new rates were devastating to Total Vision's doctors: VSP went from paying 100% of their frame wholesale costs to only 80% of such costs. VSP also dramatically reduced fees for dispensing lenses and frames. All told, these cuts resulted in millions in annual losses to Total Vision. By stymying the growth and profitability of the company and its practices, this provision served as yet another deterrent to would-be Total Vision doctors. It thus also harmed competition, by limiting Total Vision's growth and profitability, and making it less likely to compete effectively against VSP's own retail optometry locations.

102. ***Change of Control***: The 2020 Agreement also included a provision requiring VSP's consent for "[a]ny change in control of [Total Vision]." The provision further warned that VSP had "no obligation to consent in its sole and absolute discretion to such change in ownership or control or such sale or transfer of

assets if such sale or transfer is made to any competitor of any of the VSP Global companies."

103.   **Termination Language**:   VSP also insisted on including self-serving language purportedly acknowledging that the goal of the 2020 Agreement was to allow Total Vision to "exit the VSP Doctor Network" and that, after three years, Total Vision doctors would be removed from VSP's network, which Total Vision, LLC had no choice but to agree to on pain of immediate termination.   These insertions were made under duress (discussed further herein) and are not probative of any intention for the relationship between Total Vision and VSP to last only as long as the term of the 2020 Agreement.   Indeed, notwithstanding this language, VSP representatives consistently indicated to Total Vision that the contract would be renewed—just as the parties' previous one-year agreements had automatically renewed before.

104.   **Purported Release of Claims**:   Perhaps most tellingly, the 2020 Agreement contained a massively one-sided "release" of claims that, as with its other provisions, benefits VSP at Total Vision, LLC's expense.   As with the rest of the 2020 Agreement, Total Vision, LLC "agreed" to this provision under duress and as a direct result of VSP's illegal utilization of its monopoly power, because it had no other choice.

105.   The release purports to mutually release "any and all causes of action and claims for relief, known or unknown, which the Releasing Parties presently have against the Released Parties, except for Retained Claims."   The clear goal of this provision is to force Total Vision, LLC to release claims challenging VSP's conduct up to that point, including antitrust claims.

106.   The only exception is for "Retained Claims."   "Retained Claims" include "(1) any claim for relief arising from a routine audit of Claims performed in good faith at any time by or on behalf of VSP in accordance with the [Provider

Reference Manual ("PRM")] and this Agreement, (2) any Claims or debts or obligations of the sort ordinarily incurred in the regular course of business (including claims for reimbursement) between the Parties including as set forth under this Agreement or any VSP [Network Participation Agreement] or the PRM, and (3) any breach of this Agreement."

107. The upshot of this language is that the 2020 Agreement purports to release any claims by Total Vision, LLC ***challenging*** the agreement while expressly allowing VSP to bring claims ***enforcing*** the agreement, such as claims "arising from a routine audit" performed by VSP or claims for "any breach of this Agreement." The release therefore attempts to absolve VSP of antitrust liability related to the execution of the 2020 Agreement, while allowing VSP to enforce the 2020 Agreement—and its anticompetitive terms—against Total Vision, LLC.

108. It gets worse. The release goes on to provide: "Should either Party commence any action against the other Party that breaches this section [], and such action is dismissed on its merits in whole or in part on the basis that the action was settled or barred by this section [], the Party that breached this section [] shall pay ***all legal fees and costs incurred by the other Party in the action***" (emphasis added). Read literally, that would mean that if Total Vision, LLC brought antitrust claims against VSP, and *any part* of those claims was found to have been released, Total Vision, LLC would potentially have to pay "all" of VSP's legal fees and costs— ***even those related to claims not covered by the release***. Again, the obvious goal of this provision is to deter Total Vision, LLC from bringing any claims challenging the 2020 Agreement, due to the risk that any aspect of those claims will be found to have been released, leaving Total Vision, LLC on the hook for all of VSP's legal fees—even fees that relate to other, unreleased claims. And it clearly tries to impose fees on Total Vision for any unsuccessful antitrust claims, even though Section 4 of the Clayton Act only permits fees for a successful plaintiff.

109.   Moreover, even if a court were to determine the release is unenforceable (as it is), VSP insisted, as belt and suspenders, on the following damages limitation in the 2020 Agreement:  "to the extent that any claim released, or covered by the covenant not to sue, in this section [] is permitted to proceed to its resolution on the merits, the Parties agree that the aggregate sum recoverable under any or all such claims will be limited to $250,000."  This means that even if Total Vision, LLC were to prevail on an argument that the release is unenforceable, VSP could still attempt to argue that Total Vision, LLC's damages are capped at $250,000—an amount so low as to make most litigation economically irrational, and in direct contravention of the Clayton Act's provision for trebled damages for any and all antitrust violations.

110.   The release in the 2020 Agreement should be viewed for what it is:  part and parcel of VSP's anticompetitive strategy.  VSP insisted on these provisions not because they were reasonable or mutual, but to minimize the chance that Total Vision, LLC would seek relief from patently anticompetitive conduct under the antitrust laws.  Indeed, VSP insisted on these provisions *after* Total Vision, LLC raised antitrust concerns about VSP's conduct, and while it knew that Total Vision, LLC had no other choice but to accept the anticompetitive 2020 Agreement.  The release is thus a naked attempt by VSP to insulate itself from liability for the anticompetitive agreement it imposed on Total Vision, LLC.

111.   Moreover, the release and damages limitation provisions are unconscionable, both procedurally and substantively.  Procedurally, VSP forced this provision on Total Vision, LLC at the risk of a disastrous loss in coverage, meaning Total Vision had no choice but to accept it under duress.  Indeed, the entire 2020 Agreement was presented as a "take-it-or-leave-it" contract, and one which Total Vision, LLC had to take to avoid future disruptions to its business.

1    112.    Substantively, the provisions are unfairly one-sided and non-mutual,
2   because they purport to bar the claims Total Vision, LLC is most likely to bring (*i.e.*,
3   claims challenging the 2020 Agreement) while allowing the claims VSP is most
4   likely to bring (*i.e.*, claims enforcing the 2020 Agreement).  The release and its
5   damages limitation provision are also unconscionable and unenforceable because
6   they are unreasonable, violate public policy, and are designed to prevent Total
7   Vision, LLC from vindicating its rights under the federal antitrust laws and
8   California law.

9    113.    To be clear, Total Vision, LLC's claims here do ***not*** fall within the
10  release provision, since they challenge conduct that occurred after the execution of
11  the 2020 Agreement—namely, VSP's most recent threat to terminate the parties'
12  relationship.  Moreover, Total Vision, LLC's claims are based on new facts it did
13  not have in 2020, including facts based on its experience laboring under the
14  anticompetitive terms of the 2020 Agreement for the past three years.  Nonetheless,
15  that VSP insisted on including such anticompetitive (and unenforceable) terms at all
16  is emblematic of how it has abused and continues to abuse its monopoly power.

17   114.    It also bears emphasis that VSP itself has breached multiple provisions
18  of the 2020 Agreement, preventing it from attempting to enforce the release.  For
19  starters, VSP has breached Section 9.9, which requires both parties to "comply with
20  all Laws applicable to complying with and carrying out its obligations under this
21  Agreement."  VSP breached this provision by, *inter alia*, violating the antitrust laws
22  as described above.  In addition, VSP breached Section 9.2.7, which prevents VSP
23  from requiring Total Vision, LLC "to violate the independent professional judgment
24  of Providers."  VSP breached this provision by insisting that Total Vision's practices
25  push lenses and frames on their patients that are less desirable than alternative lenses
26  and frames, as described above.

27
28

34

115.   On information and belief, including based on discussions with other optometrists, Total Vision, LLC is not alone in being forced to shoulder the anticompetitive terms of the 2020 Agreement.  VSP has forced anticompetitive terms on other practices as well, as proven by the fact that the 2020 Agreement appears to be based on a form retail agreement that VSP uses with optometry practices.

116.   Even if the release were valid (it is not), it applies (at most) only to Total Vision, LLC and its "affiliates"—not to Total Vision, P.C.  To begin with, Total Vision, P.C. is not a signatory of the Agreement, and Total Vision, LLC did not have actual or apparent authority to execute an agreement on behalf of Total Vision, P.C.  This is because Total Vision, LLC and Total Vision, P.C. are structured as separate corporate entities, and have distinct directors and officers.

117.   Confirming as much, the Business Services Agreement between Total Vision, LLC and Total Vision, P.C. makes clear that Total Vision, LLC provides services to Total Vision, P.C. as an independent contractor and that Total Vision, LLC's provision of services is in no way intended to create any employment, franchise, partnership, or joint venture relationship between the two entities. Moreover, the Business Services Agreement provides that Total  Vision, LLC does not own, operate, or control Total Vision, P.C. or its optometry practice.

118.   For these reasons, although the 2020 Agreement nominally applies to Total Vision, LLC's "Affiliates," Total Vision, P.C. does not fall with the 2020 Agreement's definition of "Affiliate," which is "an entity controlled by, controlling or under common control of [VSP] or [Total Vision, LLC], as applicable, as long as such control exists."  Total Vision, P.C. is not controlled by, does not control, and is not under common control of, Total Vision, LLC.  Similarly, although the Release uses the term "affiliated entity" rather than the defined term "Affiliate," the relationship  between Total Vision, P.C. and Total Vision, LLC is such that they are not "affiliated entities."

119.   The use of the term "Affiliate" in other provisions of the 2020 Agreement further demonstrates that Total Vision, P.C. is not an "affiliate" or "affiliated entity" under the Agreement.   As one example, the definition of "Indemnitee" includes "[Total Vision, LLC], its Affiliates, the Optometry Practices and each of their shareholders, directors, officers, employees, agents, advisors, consultants, contractors, subcontractors and Optometrists and Providers…" "Optometry Practices," in turn, is defined as "those medical and/or optometry professional corporations or sole proprietorships contracted with [Total Vision, LLC], listed on Schedule 2.1" for which [Total Vision, LLC] has the right to provide management services"—such as Total Vision, P.C.  Thus, the Agreement expressly *distinguishes* between "Affiliates" and entities like Total Vision, P.C.

120.   The Agreement also contains a blanket statement to the effect that: "All Optometry Practices covered by this Agreement, including the information regarding the Providers at each of the Optometry Practices, are listed in Schedule 2.1 (the '**Optometry Practice Information**.')"  But this does not extend the scope of the Release to Total Vision, P.C.  For starters, the release separately defines the parties bound by it—and omits Total Vision, P.C.  In addition, as noted above, Total Vision, LLC did not have authority to agree to the release on Total Vision, P.C.'s behalf, nor would it make sense for Total Vision, LLC to waive claims Total Vision, P.C. may have had.

121.   In short,  Total Vision, P.C. is not an affiliate of Total Vision, LLC and therefore is not subject to the release.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E.    VSP TERMINATES THE RETAIL AGREEMENT AFTER TOTAL VISION REJECTS VSP'S LATEST ACQUISITION DEMAND**

122.    Despite the palpable burdens of doing so, Total Vision performed under the 2020 Agreement.    By early 2022, reflecting the strength of its business notwithstanding these headwinds, Total Vision had begun to receive offers to purchase its business from multiple potential counterparties.

123.    VSP seized on this opportunity to try and acquire Total Vision's lucrative business for itself.    VSP expressed interest in purchasing Total Vision, LLC, and had discussions with Total Vision's broker regarding a potential pre-emptive acquisition of Total Vision before a broader sales process kicked off.    VSP requested a non-disclosure agreement ("NDA") from Total Vision's broker, which the broker provided.    However, VSP heavily revised the NDA and Total Vision thus decided not to pursue a deal with VSP at that time.

124.    But VSP recognized that its monopoly power over vision insurance gave it leverage over Total Vision.    It thus again sought to abuse that power to obtain a deal on terms that disproportionately favored VSP while simultaneously harming competition and patients.

125.    In September 2022, Jonathan Worral (VSP's then-COO, and now president of one of VSP's subsidiaries), reached out to Total Vision, LLC and set up a call.    On the call, Worral reminded Total Vision, LLC that "your contract is coming up for renewal" and said that "as it gets closer we need to discuss what we can do to keep you in network."    To Total Vision, LLC, this was a sign of what it had been led to believe for the two prior years:  that VSP wanted to keep Total Vision in network given the parties' flourishing relationship.

126.    During this conversation, Worral said: "I also understand your company is for sale" and that VSP would like to get an NDA in place so that it could "take a look."

127.   Before entering an NDA with VSP, one of Total Vision, LLC's shareholders had a conversation with VSP to make sure that VSP was prepared to deal in good faith and pay a fair valuation for the business.  VSP assured that this was the case.

128.   Total Vision, LLC thus spent the next several months negotiating in a good faith effort to close a deal with VSP.  Its efforts were for naught, however, as VSP planned all along to use its monopoly power to get what it wanted.  VSP realized that Total Vision's need to stay "in network" with VSP, as well as the upcoming contractual renewal, gave VSP leverage it could use to negotiate a potential acquisition of Total Vision.  Armed with this leverage, rather than negotiating with Total Vision in good faith, VSP capitalized on its monopoly power to pressure Total Vision into selling its practices to VSP at a de minimis price—or else face the devastating foreclosure of its current or future practices from VSP's network.

129.   On December 12, 2022, in the midst of what Total Vision, LLC had understood were good-faith acquisition discussions, VSP sent Total Vision a letter purporting to "remind" Total Vision that the 2020 Agreement was set to expire on September 29, 2023, at which point VSP could remove all of Total Vision's providers from its network.  This reminder letter arrived at an unusual time—seven months prior to renewal, when VSP usually sent such letters at one-year marks.  More surprisingly for Total Vision, LLC, it was the *first time* after executing the 2020 Agreement that VSP had mentioned Total Vision leaving its network.

130.   The letter emphasized VSP's right to withhold its consent to a sale of Total Vision to another bidder under the Agreement's change of control provision.  The letter also stated:  "We trust these terms will be fairly represented to any of Total Vision's potential suitors for everyone's best interest."   The not-so-subtle implication was that VSP believed its right to withhold its consent for a sale of Total

Vision to another bidder would make it impossible for Total Vision to sell its business to anyone else.

131.   When VSP made an acquisition offer on February 10, 2023, its bid and accompanying valuation were wildly below the other indications Total Vision had received.  VSP's offer provided both "low" and "high" valuations of Total Vision, but even its "high" valuation was less than *half* of the offers provided by other firms.

132.   Nonetheless, VSP's then-COO, Jonathan Worral, insisted that Total Vision should "counter" its offer, with the implied threat being that failure to engage on VSP's terms would result in VSP withdrawing coverage from Total Vision practices.  Accordingly, when Total Vision reasonably rejected VSP's offer as implausibly low and sought instead to discuss renewal of the existing Retail Agreement, VSP went dark and stopped responding to Total Vision's requests entirely.

133.   On March 7, 2023, after weeks of radio silence, VSP sent Total Vision, LLC a notice of nonrenewal.  VSP's decision came as a shock to Total Vision.  Throughout the course of the 2020 Agreement, none of the partners at VSP and Marchon that Total Vision, LLC worked with on a day to day level—including Worral, Shoreen Noguchi, VSP's Provider Network Development Program Manager, and Dena Peter, VSP's Director of Retail and Strategic Accounts—gave any indication that VSP had any intent of terminating the Agreement. They further gave every indication that they expected Total Vision to stay on network with VSP for the indefinite future, including as late as June 2023, via additional comments from Worral.

134.   In fact, it was only due to the prospect of renewal that Total Vision, LLC agreed to the one-sided, anticompetitive terms in the 2020 Agreement in the first place.  It soon became clear, however, that VSP merely dangled the prospect of

a renewal only to force Total Vision, LLC to agree to terms that would detriment Total Vision to the benefit of VSP.

135.    On July 20, 2023, Total Vision, LLC sent VSP a letter demanding that VSP cease its anticompetitive behavior and requesting that the parties come to a mutually agreeable solution that would allow them to resume their profitable course of dealing.

136.    VSP responded on August 2, 2023.   It denied engaging in any anticompetitive conduct and reiterated that it would not deviate from its resolution to terminate Total Vision from its network, stating:   "On September 29, 2023, as agreed, TV doctors will cease to be members of the VSP Doctor Network."

137.    Total Vision, LLC made multiple proposals to VSP to reinforce the partnership between the parties, but none were agreeable to VSP.  Despite good-faith efforts by Total Vision, LLC to extend the parties' agreement, VSP has thus far rebuffed all such efforts, and confirmed that it intended to terminate Total Vision from its network in September 2023.  The irony of this is that VSP justified its decision to not renew Total Vision practices on the purported basis that they are part-owned by a private equity group and thus not "completely" owned by the optometrists providing vision care.  Putting aside that this conflates Total Vision, P.C. with Total Vision, LLC, VSP has no problem, however, with its own partly-owned optometry practices remaining on network, even though its own optometrists are simply employees of a larger corporation and have no ownership interest in their own previously independent practices.

138.    VSP has profited handsomely under the 2020 Agreement, and it would continue to do so in both the short- and long-term had it not terminated that agreement.   Indeed, VSP's relationship with Total Vision has been extremely lucrative for VSP, allowing VSP to add more patients to its network, sell additional frames and lenses through its subsidiaries, bring more business to its labs, and

expand its management services.  VSP has likely made millions of dollars, if not more, from its relationship with Total Vision.  There are thus no legitimate or procompetitive justifications for its newfound refusal to deal with Total Vision— this is purely about eliminating a rival in order to scoop up the remains for itself.

139.    Moreover, Total Vision, LLC has time and time again honored all terms of the 2019 and 2020 Agreements and is not in breach of any of its obligations thereunder.

140.    VSP's motivations are clear, given the broader context of the industry. VSP is both establishing new optometry practices and acquiring existing ones— including the 700-plus location Visionworks brand—and does not allow *any* of the optometrist sellers to acquire an ownership interest in VSP.  By contrast, Total Vision currently supports 59 practices, and the owner of every one of those practices is also a part owner of Total Vision.  This shows VSP is not concerned about the viability of independent practices and optometrist ownership, so it could not defend its threats to Total Vision on that basis.  Rather, VSP wants to stomp out or acquire competitors like Total Vision because it is worried they will grow and take market share that VSP hopes to gain for itself.  Further proving this point, VSP has allowed other non-optometrist-owned groups to stay on network when those groups do not pose a threat to its growing retail business.

141.    Indeed, proving its stated rationale for terminating Total Vision from its network has nothing to do with supporting independent practices, many of the optometrists that will be harmed by VSP's actions have been on VSP's network for *decades*.  Summarily terminating these optometrists jeopardizes their business; it does nothing to support them.  And it confirms that VSP's actions are driven by anticompetitive and bad-faith animus toward Total Vision, not any issue with the independent practices that Total Vision supports.

142.   It also bears emphasis that any "benefits" to VSP of refusing to deal with Total Vision and all similar optometry service providers accrue to the detriment of competition.  By refusing to deal with Total Vision (and, on information and belief, similar competitors), VSP harms Total Vision, thereby halting the growth of a practice group that has more market presence and ability than independent optometrists to negotiate for better terms with VSP, or even potentially to facilitate the migration of a sufficient number of patients to an alternate insurer.  Moreover, by making an example out of Total Vision, VSP is attempting to deter other provider groups from doing anything but capitulating to VSP's demands.  VSP's anticompetitive actions toward Total Vision thus help maintain VSP's monopoly in the vision insurance market and marginalize horizontal competitors in the brick-and-mortar retail optometry market and market for acquiring independent optometry practices.

143.   VSP's acts and threats—if left unaddressed—will also harm patients, who will lose access to their preferred provider or be forced to pay for services at a much higher cost, especially out of pocket.

144.   Even if taken at face value, VSP's alleged concerns about independent practices do not justify its anticompetitive conduct.   Independent optometry practices should have the choice to join a group like Total Vision—VSP should not make that choice for them by driving Total Vision out of business or artificially capping its growth.  In any event, for VSP—a monopolist vision insurer and now one of the largest optometry networks in the country—to claim it protects independent optometrists is akin to the fox claiming to guard the henhouse.

## VSP'S ANTICOMPETITIVE ACTIONS HAVE HARMED COMPETITION

### A.   THE RELEVANT PRODUCT MARKETS

145.   There are five relevant product markets in which VSP's actions have harmed competition.

1.      **The First Relevant Product Market:  Independent Optometry Practices**

146.  ***Product Market***:  Independent optometry locations are places at which a patient can be examined by an optometrist, who can determine a patient's visual acuity and assess other aspects of a patient's eye condition, in order to provide the patient with an appropriate prescription for eyeglass or contact lenses.  Optometrists can also diagnose and treat certain eye conditions.  Patients can also purchase eyeglass frames, lenses, contact lenses, and accessories at a retail optometry practice.

147.  Independent optometry practices constitute a distinct and relevant product market from corporate optometry practices, for several reasons.

148.  *First*, they provide distinct services from other types of medical professionals, including eye-related medical professionals.  As an initial matter, optometry is a distinct type of medical service, focusing on general vision assessment and correction.  Although ophthalmologists similarly focus on the assessment of the eye, they tend to be more specialized and focus on providing medical care for specific types of eye disease or other eye conditions.  To provide an analogy, the difference between an optometrist and ophthalmologist is effectively the difference between a GP and a specialist, or the difference between an audiologist and an ENT doctor.  Both categories provide similar, but importantly distinguished services, and patients seek out the former in each group much more than the latter until there is a specific problem to diagnose and solve.

149.  As for the difference between independent and other types of optometrist, there is widespread industry recognition that independent optometry constitutes its own relevant market.[16]  Independent optometry practices are run by

---

[16]  *See, e.g.*, Elizabeth Spaulding, *Do you see what we see? The future of independent optometry*, BAIN & COMPANY (2012), https://media.bain.com/Images/BAIN_BRIEF_The_future_of_independent_optometry.pdf  ("In 2010, Bain & Company surveyed 6,000 US consumers, testing preferences for eye care services

optometrists and provide comprehensive vision assessment and correction services tailored to their individual clients.  They are almost always located in standalone offices (whether in their own building or a space in a commercial building/complex). Furthermore, independent optometry practices are more akin to a traditional doctor's office, with repeat customers who come back year after year for comprehensive eye services, and who seek out specific optometrists to have their personal eye specialist (akin to a medical GP).  In contrast, corporate optometry practices are typically located in retail stores and serve as vehicles to bring in customers to shop at the broader store.  They are usually viewed and treated as a one-off visit when someone needs to update or obtain a prescription, and/or if they do not want to seek out comprehensive eye services.  For example, Total Vision's independent optometrists require patients to complete a full eye examination before the optometrist will prescribe any glasses or contact lenses.  Corporate optometrists do not always adhere to such rigorous standards and instead tend to offer simpler services, often at a lower cost.  Thus, patients are more likely to visit independent optometrists for both medical care and refractive care (*i.e.*, receiving eye exams to assess their prescription), whereas they are more likely to visit corporate optometrists solely for refractive care to purchase new glasses (which are usually offered by the store hosting the corporate optometry practice).

150.  *Second*, and relatedly, independent optometry practices tend to charge more than corporate optometry practices for their services.  Corporate optometry

---

and identified three consumer segments: Independent Loyalists: Consumers who receive eye exams and purchase glasses or contacts from independent optometrists; Hybrid Spenders: Consumers who receive eye exam services from one type of location (typically independent optometrists) and purchase glasses or contacts from another type of location (such as retail chains); Chain Loyalists: Consumers who receive eye exams and purchase glasses or contacts from retail chains."); Taylor, R. Michael, *Deprofessionalization of the corporate optometrist? Contrasting characteristics of the bureaucratic and professional models*, UNIVERSITY OF ALABAMA AT BIRMINGHAM PROQUEST (2007) (comparing levels of autonomy, income, and job satisfaction for corporate and noncorporate optometrists).

practices are more akin to volume businesses—serving a large number of customers with relatively standardized services—whereas independent optometry practices provide more specialized services at a higher cost.  Moreover, corporate optometry practices often benefit from economies of scale by operating practices within larger stores like Walmart or Costco, while independent optometrists tend to have their own storefront with all the attendant costs.  Given this difference in price structure (which reflects that patients seek out independent optometry practices exactly because they are more comprehensive and personalized), a hypothetical monopolist of independent optometry practices could profitably impose a small but significant non-transitory increase in price ("SSNIP") (*e.g.*, 5%), because patients would not switch away to corporate optometry practices in sufficient numbers to make such a SSNIP unprofitable.  Indeed, independent optometry practices' distinct pricing is well-recognized in the industry.[17]

151.  *Third*, because of the comprehensive and personalized services provided by independent optometrists and the resulting costs, independent optometrists often attract distinct types of patients from corporate optometrists. Specifically, independent optometrists cater to patients with more specialized needs such as non-standard prescriptions due to astigmatism or sensitive eyes that necessitate frequent adjustments to lenses and frames.  Such patients are willing to undergo relatively longer visits and develop a relationship with one optometrist they can visit routinely for vision care due to their need for comprehensive and personalized services.  Because their services are generally more expensive, independent optometrists also tend to attract patients with vision insurance, or patients with comparatively extensive vision insurance coverage.  In contrast,

---

[17]  *See, e.g.*, VISION CENTER, *How Much is an Eye Exam Without Insurance* (July 28, 2023), https://www.visioncenter.org/pricing/eye-exam-without-insurance/ ("Many retail vision providers will charge less than $100, while independent eye doctors may charge more.").

corporate optometrists tend to have patients who do not require more specialized services or cannot afford them, including due to lack of insurance coverage, and are looking to obtain a prescription for lenses or pick up frames in a faster way and at a lower cost.

152.   There are no reasonably interchangeable substitutes or alternatives to the market for independent optometry practices, as proven by the fact that millions of Americans choose to visit independent optometrists every year, rather than simply visiting an optometrist at their local Walmart or Costco.  Moreover, while such optometric goods and services may also be available from ophthalmologists (who are medical doctors), the latter are usually much more expensive, and for most patients, there is no need to visit an ophthalmologist to receive goods and services that can be provided by an optometrist, because ophthalmologists are typically specialists who address more serious eye conditions.  Further, while patients can buy glasses and contact lenses on the internet, the overwhelming majority of eye exams and diagnoses need to be conducted in person by a trained professional.  Patients are likely to purchase glasses and contact lenses from the same optometry locations at which they are examined, both for convenience and for cost efficiencies.

153.   ***Geographic Market***:  At a minimum, the relevant geographic market for independent optometry practices is the State of California.   Independent optometry practices in California are subject to California's specific set of regulations for optometry practices.  Total Vision operates exclusively in California, proving California is a distinct geographic market.  VSP's own website likewise has a section specifically targeting California.

154.   The relevant geographic market for independent optometry, however, is more narrowly limited to various metropolitan service areas ("MSAs") in California in which Total Vision operates: the Los Angeles-Long Beach-Anaheim MSA; the San Diego-Chula Vista-Carlsbad MSA; the Riverside-San Bernardino-

Ontario MSA; the San Francisco-Oakland-Berkeley MSA; and the San Jose-Sunnyvale-Santa Clara MSA.  For obvious practical reasons, including the costs of travel in time and fuel, the overwhelming majority of patients at optometry locations visit locations within the MSA in which they live and work.  Thus, competition from outside any given MSA is not sufficient to prevent a hypothetical monopolist of independent optometry in a particular MSA from profitably imposing a small but significant non-transitory price increase.

> **2.      The Second Relevant Product Market: Vision Insurance For Independent Optometry Practices**

155.   ***Product Market***:  Vision insurance covers a vision patient's costs (sometimes with a copay by the patient) for optometry and optical goods and services.  Such goods and services include eyeglasses, contact lenses, eye exams, diagnoses, and treatments.

156.   The majority of optometry patients are insured, many of whom receive insurance procured through their employer.  For example, over 90% of Total Vision's patients are insured.

157.   There are no reasonably interchangeable substitutes or alternatives to vision insurance, as the coverage it provides is most often not provided by traditional health insurance.  Although patients can choose to be uninsured, for patients who require glasses or contacts, and for those who otherwise have or may develop vision issues, vision insurance can significantly decrease the costs of their vision care.

158.   Within the market for vision insurance, there is a distinct submarket for vision insurance for independent optometry practices, for the reasons discussed above. *Supra* ¶¶ 149-51.

159.   Although VSP easily has both monopoly and market power in the overall vision insurance market, its monopoly and market power are even more pronounced in the market for vision insurance for independent optometry practices.

This is because, as discussed above, *supra* ¶ 150, independent optometry practices charge more for their comprehensive services and thus their patients rely more heavily on vision insurance than corporate optometry customers do.

160.   ***Geographic Market***:  The relevant geographic market for the market for vision insurance (including for vision insurance for independent optometry practices) is the State of California.

161.   The terms and costs of vision insurance vary by state due to state-specific regulations, and patients in a particular state will almost certainly be insured by a vision insurance plan approved within that state by an insurer that is licensed within the state, whether the patient receives vision insurance through an employer or purchases an individual plan.  Confirming that California constitutes a distinct geographic market, VSP maintains a California-specific website for patients insured in California.[18]

### 3.   The Third Relevant Product Market: Glasses Frames

162.   ***Product Market***:  Glasses frames constitute a relevant product market.

163.   Glasses frames contain hard lenses, and thereby provide the structural apparatus of the devices worn by consumers to correct vision.  Glasses frames are constructed and sold separately from the lenses they contain, and by different manufacturers.

164.   There are no reasonably interchangeable substitutes or alternatives to glasses frames, which are necessary for wearing corrective glasses lenses on the face. While consumers can also wear contact lenses directly on the eyeballs, many consumers find contact lenses uncomfortable or otherwise cannot wear contact lenses due to certain eye conditions.  For these consumers, contact lenses are not reasonable substitutes or alternatives to glasses frames with lenses.  Moreover, even

---

[18] http://www.stateofcaemployee.vspforme.com/.

people who frequently wear contact lenses use glasses on certain days or for a certain amount of time per day, so as to avoid the discomfort of extended use of contact lenses.  For these people as well, contact lenses are not reasonable substitutes or alternatives to glasses frames with lenses, because (by definition) contact lenses cannot provide them with respite from the extended wearing of contact lenses.

165.   Thus, a hypothetical monopolist of glasses frames could profitably maintain a small but significant non-transitory increase in price.

166.   ***Geographic Market***:  Due to the internet and contemporary shipping and logistics, the geographic market for glasses frames is the United States.

### 4.    The Fourth Relevant Product Market:  Glasses Lenses

167.   ***Product Market***:  Glasses lenses constitute a relevant product market.

168.   Glasses lenses are hard lenses that are inserted into glasses frames to be worn on the face by consumers to correct vision.

169.   There are no reasonably interchangeable substitutes or alternatives to glasses lenses.  Although many consumers can also wear contact lenses directly on the eyeballs, many consumers find contact lenses uncomfortable or otherwise cannot wear contact lenses due to certain eye conditions.  For these customers, contact lenses are not reasonable substitutes or alternatives to glasses lenses contained in glasses frames.  Moreover, even people who frequently wear contact lenses use glasses on certain days or for a certain amount of time per day, so as to avoid the discomfort of extended use of contact lenses.  For these people as well, contact lenses are not reasonable substitutes or alternatives to glasses lenses contained in glasses frames, because (by definition) contact lenses cannot provide them with respite from the extended wearing of contact lenses.

170.   Thus, a hypothetical monopolist of glasses lenses could profitably maintain a small but significant non-transitory increase in price.

171.   *Geographic Market*:  Due to the internet and contemporary shipping and logistics, the geographic market for glasses lenses is the United States.

**5.     The Fifth Relevant Product Market:  Optometry Practice Management Software**

172.   *Product Market*:  Optometry practice management software constitutes a relevant product market.

173.    Optometry practice management software is computer software that provides optometry practices with organizational and record-keeping support.  Such software is necessary for an optometry practice to compete.

174.   There are no reasonable substitutes or alternatives to optometry practice management software.  Practice management software designed for other service providers is insufficiently tailored to optometrists' needs to provide a competitive constraint.

175.   Thus, a hypothetical monopolist of optometry practice management software could profitably maintain a small but significant non-transitory increase in price.

176.   *Geographic Market*:  Because software designed and sold anywhere in the country can be installed with equal ease at optometry practices, the relevant geographic market for optometry practice management software is the entire United States.

**B.     VSP'S ANTICOMPETITIVE ACTIONS HAVE HARMED COMPETITION IN THE RELEVANT MARKETS**

177.   VSP's actions have harmed competition in multiple ways and their individual and cumulative anticompetitive effects are (and, if left unchecked, will be) even more pronounced.  Although Total Vision successfully fended off VSP's attempts to impose on it an explicit growth cap in 2020, VSP's tying arrangements, its steady stream of threats, and its actual termination of Total Vision from its

network amount to essentially that.  As noted, *supra* ¶ 95, Total Vision would have grown at least 117 percent more absent VSP's termination threats and efforts to cap VSP's growth.

178.   VSP has further used its market power in the vision insurance market to extract agreements from Total Vision, LLC that it will purchase other products, such as lenses and frames from VSP's subsidiaries at uncompetitive prices.  VSP has also likely extracted similar agreements from other optometry practices.

179.   As has been the case for decades, independent optometry practices—and even groups of a few dozen practices like Total Vision—remain at the mercy of VSP due to VSP's dominance in the insurance market.  Optometrists part of a group like Total Vision, who reasonably desire to provide services to patients covered by VSP insurance since those patients constitute the majority of patients overall, are forced to accept coercive tying arrangements with respect to eyeglass frames, lenses, practice management software, and other products and services sold by VSP subsidiaries.  These arrangements are costly to Total Vision providers, who are forced to divert their resources into purchasing VSP products at supracompetitive prices instead of spending money on patient care—and therefore costly to patients, who are deprived of the benefits of optimal optometric services.

180.   Because it is difficult for patients to switch between lenses, VSP's tying provisions create product lock-ins.  These arrangements benefit VSP, but they harm competition by restraining practices from shifting to better and/or cheaper options and by deterring potential market entrants who are unable to offer similarly tied products.  Moreover, because many independent optometry practices depend on VSP, VSP's tying arrangements threaten substantial foreclosure in the tied product markets—rendering them per se violations of the Sherman Act.

181.   VSP cannot advance any legitimate procompetitive justification for its conditioning of access to its insurance network on Total Vision's purchase of other

VSP products. These self-serving arrangements—which VSP foisted upon practice groups like Total Vision through take-it-or-leave-it contracts—are not motivated by genuine quality control concerns, regard for patient welfare, product synergies, or cost-saving purposes, let alone any logical relation whatsoever between the tied products and the provision of vision insurance.

182. Moreover, any putative benefits for VSP's tying arrangements are vastly outweighed by the significant burdens they impose on competition. These restraints injure competition in the retail optometry, glasses frames, lenses, and practice management system markets by creating barriers to entry and stamping out rivals who cannot respond with similar bundles because they lack VSP's clout in the vision insurance market. And they injure patients and optometrists by interfering with clinical discretion and limiting their ability to shift to superior and more cost-effective standalone alternatives.

183. Confirming that such self-preferencing terms hurt consumers, recent legislation in Nevada and Texas targets the ability of vision insurers like VSP to foist these very sorts of anticompetitive terms on medical providers. Nevada signed S.B. 134 on June 12, 2023, which prevents insurers from requiring providers to use specific laboratories starting October 1, 2023. Texas's H.B. 1696, which was signed on June 16 and goes into effect on September 1, 2023, prevents insurers from steering patients towards particular in-network optometrists and retail locations owned by the insurer, and offering optometrists different reimbursement rates based on which labs or products they opt to use. Dr. Jennifer Deakins, president of the Texas Optometric Association, explained that the Texas law addresses "the

controlling tactics of vision plans who 'steer' patients to their vision plan 'co-systems.'"[19]  VSP has filed suit to enjoin enforcement of the Texas legislation.

184.  On May 3, 2023, the Dental and Optometric Care (DOC) Access Act was reintroduced in the Senate.  The legislation would increase fairness in doctor-insurer agreements and prevent insurers from limiting doctors' choice of medical labs.  VSP has spent hundreds of thousands of dollars lobbying against passage of the Act.

185.  Further, as noted, VSP issued a termination notice for the 2020 Agreement, and therefore will expel all of Total Vision's providers from its network come September 29, 2023.  This will have severe effects on Total Vision, its supported optometrists, and their patients.  As explained by the DOJ in the 1990s, and as remains the case today, optometry practices in areas where VSP has sufficient dominance (including California) are at a significant competitive disadvantage without access to VSP's insurance network, because VSP controls the majority of the vision insurance market.  This is especially true for independent optometry practices, such as Total Vision practices, which risk becoming unprofitable unless they remain on VSP's network.  VSP's refusal to deal thus poses a grave threat for Total Vision and its supported practices.

186.  VSP's actions also make it impossible for Total Vision to continue growing its practice.  New optometrists are highly unlikely to join Total Vision once they learn VSP does not support it.  And new patients are unlikely to begin seeing a Total Vision optometrist if they have insurance through VSP, due to the risk that insurance will not cover their services.

---

[19] AMERICAN OPTOMETRIC ASSOCIATION, *Doctors of Optometry in Texas and Nevada Build Bulwark Against Vision Plan Abuses* (June 21, 2023),  https://www.aoa.org/news/advocacy/state-advocacy/doctors-of-optometry-in-texas-and-nevada-build-bulwark-against-vision-plan-abuses.

187. But VSP's conduct does not just harm Total Vision; it also harms independent optometry practices and patients who work with Total Vision. Independent optometrists who wish to join Total Vision lose the ability to achieve the efficiencies that Total Vision provides and the corresponding freedom to focus on patient care and service. Optometrists who want to join a practice group but are undecided as to which one are deprived of the competition that Total Vision can provide, which disciplines competitors such as VSP Ventures.

188. Moreover, patients at optometry practices throughout California are deprived of the competitive benefits to service and pricing that a strong competitor such as Total Vision provides. Indeed, when VSP began taking steps to terminate the Retail Agreement in 2020, it threw Total Vision's practices into disarray, caused myriad difficulties for optometrists and patients alike, and diminished competition by casting Total Vision's prospective contracts with providers into doubt. These effects are especially pronounced for patients who have been seeing the same eye doctor for years—or even decades—and now risk being unable to do so due to VSP's termination threats.

189. The effects of VSP's anticompetitive conduct extend to the vision insurance market as well. While optometrists have historically lacked (and continue to lack) sufficient market presence to push back against VSP's anticompetitive behavior, one way in which they can temper VSP's conduct is for independent optometry practices to join together in groups. Such groups allow for efficient pooling of managerial and operational resources to achieve more favorable business conditions and effective patient treatment, and they also provide for greater bargaining power. It is comparatively difficult for VSP to bully a sufficiently large group of practices because such a group could cause a comparatively sizable loss for VSP were it to leave the VSP insurance network.

190.   As noted, under California law, a single optometry practice can have no more than 11 locations.  Cal. Bus. & Prof. Code § 3077(b).  In order to form a larger group that can better compete in the marketplace without violating this limitation, optometrists can pool their nonclinical assets into a management company, such as Total Vision, LLC, which then supports multiple optometry practices.  By denying network participation to any practice that contributes assets into a management company, and thereby ensuring that its retail competitors for VSP-insured patients will never have more than 11 locations in California, VSP ensures that it will always be the whale in a pond of minnows.

191.   Moreover, while alternate insurers have a difficult time competing in a VSP-dominated landscape, if a sufficiently large group of optometry practices were to make a concerted effort to migrate its patients to an alternate or incipient insurer, that insurer would have a better chance of surviving.  It is this dynamic that explains how VSP's suppression of optometry practice groups helps it maintain its monopoly in the vision insurance market.

192.   Not least, VSP's anticompetitive conduct is without regard for the scores of Total Vision patients who risk suddenly losing access to their preferred doctors or having to pay for services out of pocket.  VSP's willingness to disrupt the network coverage of these patients for its own benefit makes clear that its focus is not patient-centered care but VSP's own bottom line.

193.   The harms VSP has inflicted on Total Vision (and competition more broadly) do not come by way of VSP's superior skill or acumen, nor by luck.  Rather, they come from VSP's anticompetitive sidelining of Total Vision, notwithstanding a years-long and profitable prior course of dealing between the two businesses.  VSP's termination of this longstanding relationship is irrational but for the anticompetitive effect of preventing the growth of optometry groups and VSP's desire to line its own pockets at the expense of patients.

## C.    TOTAL VISION, LLC AND TOTAL VISION, P.C. HAVE ANTITRUST STANDING

194.    VSP's anticompetitive conduct has already injured Total Vision, LLC, Total Vision, P.C., and competition, and would magnify that harm if left unaddressed.

195.    VSP's abuse of its monopoly and market power in the vision insurance market harms Total Vision, its optometrists, and its patients and consumers of VSP's vision insurance network.   Among other anticompetitive effects, VSP's illegal exercise of its monopoly power leads to, as the AOA puts it, "vision plans [] exercis[ing] more control over doctors' practices" and "doctors' choice in products for patients [being] limited based on what's in the best interest of VSP rather than what's in the best interest of the patient."

196.    VSP's tying arrangements harm competitors in the glasses frames, glasses lenses, and optometry practice management software markets, who cannot fairly compete with the higher prices VSP is able to impose by bundling those products with access to its monopoly insurance network.   They likewise harm the customers of VSP's competitors in the tied markets, including Total Vision, by impairing their ability to switch to better products and offer patients the full array of available treatment options.   And VSP's tying arrangements also harm consumers of optometry goods and services, who ultimately bear the costs of dampened competition and diminished choice.

197.    VSP's conduct has materially and substantially injured Total Vision by, among other things, substantially decreasing Total Vision's patient volume, revenue, profitability, and business value as a company.   Total Vision's practices are retail, low-margin businesses.   Their profit margins are generally under 20% after accounting for corporate overhead, leaving little room for additional hits to revenue and making continued growth critical to their success.   But, as noted, over 60% of

Total Vision's patients have vision insurance through VSP.  And many of these patients—including those with coverage through Medicaid or generous benefit plans that include Total Vision—are highly unlikely to stay with Total Vision if it loses access to VSP's network.  Moreover, losing access to VSP's network would increase Total Vision's operating costs due to the need to find costly workarounds for any patients that are willing to stay with Total Vision after losing access to VSP's insurance network.  Overall, losing access to VSP's network means Total Vision will lose patients, face stymied growth, shoulder increased costs, and risk becoming unprofitable.

198.  VSP's refusal to deal with Total Vision also threatens to deprive optometry practices and patients of the benefits of vigorous competition between alternate practice groups.  By squeezing out practice groups like Total Vision and making it infeasible for independent practices to join rival practice groups for fear of losing VSP coverage, VSP deters potential entrants from acquiring independent retail optometry practices.  This in turn harms the growth of the vision insurance market, as it prevents practices from banding together to hedge against the possible negative consequences of switching to alternate insurers.

199.  VSP's unlawful monopolization and abuse of its market power has also materially and substantially harmed competition and injured consumer welfare by, among other things:

a.  Raising prices and reducing consumer choice in the market for independent optometry practices by limiting the growth and profitability of independent optometry practices like Total Vision, and thereby limiting competition in the market for independent optometry practices;

57

b. Foreclosing competition in the vision insurance market by suppressing the growth of practice groups with sufficient market presence to make alterative insurers viable;

c. Maintaining supracompetitive pricing of vision insurance through the foreclosure of competition in the vision insurance market achieved in part by suppressing the growth of practice groups;

d. Suppressing competition in the market for independent optometry practices by decreasing the number of options available to independent practices who seek to join practice groups;

e. Decreasing the value of independent optometry practices by limiting the number of competitive bidding groups for such practices;

f. Decreasing the quality of care to optometry patients by suppressing practice-group arrangements that allow optometrists to focus more on patient care rather than administrative and managerial work;

g. Foreclosing competition and maintaining supracompetitive pricing in the glasses frames, glasses lenses, and optometry practice management software markets by providing VSP subsidiaries with anticompetitive advantages in those markets; and

h. Enabling VSP-backed optometry practices to achieve the operational efficiencies that VSP denies other practice groups, and thereby providing VSP-backed optometry practices with an anticompetitive advantage in the independent optometry market.

200. If VSP's continuing anticompetitive conduct is not enjoined, harm to competition and injury to Total Vision and others will continue and increase substantially.

201. The harms described herein are of the type that the antitrust laws were designed to prevent.

58

202.   In contrast to this wide range of anticompetitive effects, no valid procompetitive business rationale can justify VSP's tying arrangements, its efforts to "Cap[] [Total Vision's] Growth" nor its refusal to deal with Total Vision.

## INTERSTATE COMMERCE

203.   VSP's activities that are the subject of this complaint are within the flow of, and have substantially affected, interstate trade and commerce.

204.   Total Vision practices sell, and VSP insures, a significant amount of optometry goods that are produced in other states (including those of VSP-owned and New York-headquartered Marchon).

## FIRST CAUSE OF ACTION

### (Unfair Competition – Cal. Bus. & Prof. Code § 17200 et seq.)

### (Total Vision, P.C. Against All Defendants)

205.   Plaintiff Total Vision, P.C. repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully restated herein.

206.   VSP has engaged, is engaging, and threatens to continue to engage in unlawful and unfair business practices as described herein.

207.   VSP's and its subsidiaries' violations of federal antitrust laws constitute unlawful businesses practices under California's Unfair Competition Law, Business & Professions Code §17200 *et seq*. (the "UCL").

208.   Regardless of whether VSP's actions violate federal antitrust laws, they constitute unfair business practices under the UCL because they: threaten incipient violations of antitrust laws; violate the policy or spirit of the antitrust laws because their effects are comparable to or the same as violations of the laws; and otherwise significantly threaten or harm competition.

209.   Total Vision, P.C. has suffered injury-in-fact as a result of VSP's unlawful and unfair business practices, which have caused and continue to cause Total Vision, P.C. to lose a significant amount of money and property.

210.   Total Vision, P.C. seeks injunctive relief preventing VSP from continuing to engage in unlawful and unfair business practices in violation of the UCL.

## SECOND CAUSE OF ACTION

### (Monopolization – Sherman Act, 15 U.S.C. §§ 2, 15)

### (Total Vision, P.C. Against VSP)

211.   Plaintiff Total Vision, P.C. repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully restated herein.

212.   Vision insurance in the market for independent optometry practices constitutes a relevant product market and California constitutes a relevant geographic market under the antitrust laws.

213.   VSP has monopoly power in the market for vision insurance for independent optometry practices in California.

214.   As elaborated herein, VSP has willfully maintained its monopoly in the vision insurance market in California.

215.   VSP's willful maintenance of its monopoly has caused reduced competition, and that reduction in competition has caused antitrust injury to Total Vision, P.C. and others.

## THIRD CAUSE OF ACTION

### (Attempted Monopolization – Sherman Act, 15 U.S.C. §§ 2, 15)

### (Total Vision, P.C. Against VSP)

216.   Plaintiff Total Vision, P.C. repeats and realleges each and every allegation contained in in the foregoing paragraphs as if fully restated herein.

217.   Vision insurance in the market for independent optometry practices constitutes a relevant product market and California constitutes a relevant geographic market under the antitrust laws.

218.   VSP has, at least, market power in the market for vision insurance for independent optometry practices in California.

219.   As elaborated herein, VSP has engaged in predatory and anticompetitive conduct.

220.   VSP has acted with the specific intent to monopolize the vision insurance market.

221.   VSP's attempt to monopolize has caused reduced competition, and that reduction in competition has caused antitrust injury to Total Vision, P.C. and others.

## FOURTH CAUSE OF ACTION

### (Tying – Sherman Act, 15 U.S.C. §§ 1, 2, 15 – Per Se Illegal)

### (Total Vision, P.C. Against VSP)

222.   Plaintiff Total Vision, P.C. repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully restated herein.

223.   The market for vision insurance is distinct from the markets for glasses frames, glasses lenses, and optometry practice management software.

224.   VSP tied Total Vision, P.C.'s access to VSP's monopoly insurance network to Total Vision, LLC's and, ultimately, Total Vision, P.C.'s purchase of glasses frames, contact lenses, and optometry practice management software from VSP and its subsidiaries.

225.   VSP possesses (and at all times relevant possessed) monopoly power in the market for vision insurance for independent optometry practices in California, which is the tying market.  VSP's monopoly power in the tying market is and was sufficient to coerce Total Vision into purchasing glasses frames, glasses lenses, and optometry practice management software, which are the tied products.  VSP's tying

arrangements caused Total Vision to forego the purchase of glasses frames, glasses lenses, and optometry practice management software from VSP's competitors in those markets.

226.   VSP's tying arrangements have affected a not insubstantial amount of commerce, caused antitrust injury to Total Vision, P.C., and have decreased competition in the tied product markets.

## FIFTH CAUSE OF ACTION

### (Tying – Rule of Reason – Sherman Act, 15 U.S.C. §§ 1, 2, 15)

### (Total Vision, P.C. Against VSP)

227.   Plaintiff Total Vision, P.C. repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully restated herein.

228.   The market for vision insurance is distinct from the markets for glasses frames, glasses lenses, and optometry practice management software.

229.   VSP tied Total Vision's access to VSP's monopoly insurance network to Total Vision, LLC's and, ultimately, Total Vision, P.C.'s purchase of glasses frames, contact lenses, and optometry practice management software from VSP and its subsidiaries.

230.   None of these tying arrangements present any legitimate procompetitive benefits that could not be achieved through alternative means.

231.   The anticompetitive aspects of VSP's tying arrangements outweigh any alleged procompetitive effects.   By preventing Total Vision, P.C.—and other practice groups that depend on VSP's insurance network for revenue—from utilizing alternative optometry management software systems and mandating minimum purchases of glasses frames and contact lenses, VSP unduly restricts competition in the tied product markets.

232.   VSP's tying arrangements have affected a not insubstantial amount of commerce, caused antitrust injury to Total Vision, P.C., and have substantially foreclosed competition in the tied product markets.

## SIXTH CAUSE OF ACTION

### (Tying – Cal. Bus. & Prof. Code § 16720 et seq.)

### (Total Vision, P.C. Against VSP)

233.   Plaintiff Total Vision, P.C. repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully restated herein.

234.   The market for vision insurance is distinct from the markets for glasses frames, glasses lenses, and optometry practice management software.

235.   VSP tied Total Vision, P.C.'s access to VSP's monopoly insurance network to Total Vision, LLC's and, ultimately, Total Vision, P.C.'s purchase of glasses frames, contact lenses, and optometry practice management software from VSP and its subsidiaries.

236.   VSP possesses (and at all times relevant possessed) monopoly power in the market for vision insurance for independent optometry practices in California, which is the tying market.  VSP's monopoly power in the tying market is and was sufficient to coerce Total Vision, P.C. into purchasing glasses frames, glasses lenses, and optometry practice management software, which are the tied products.  VSP's tying arrangement caused Total Vision, P.C. to forego the purchase of glasses frames, glasses lenses, and optometry practice management software from VSP's competitors in those markets.

237.   VSP's tying arrangements have affected a not insubstantial amount of commerce, caused antitrust injury to Total Vision, P.C., and have decreased competition in the tied product markets.

## SEVENTH CAUSE OF ACTION

### (Monopolization – Refusal to Deal – Sherman Act, 15 U.S.C. §§ 2, 15)

### (Plaintiffs Against VSP)

238.   Plaintiffs Total Vision, P.C. and Total Vision, LLC repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully restated herein.

239.   Vision insurance in the market for independent optometry practices constitutes a relevant product market and California constitutes a relevant geographic market under the antitrust laws.

240.   VSP has monopoly power in the market for independent optometry practices in California.

241.   VSP has willfully maintained its monopoly in the vision insurance market in California by refusing to deal with Plaintiffs.

242.   VSP's refuses to deal with Plaintiffs despite a history of profitable dealing.  VSP has profited handsomely under the 2020 Agreement and has likely made millions of dollars, if not more, from its relationship with Total Vision.  VSP would continue to profit in the long and short term had it not terminated the 2020 Agreement.  Therefore, VSP is sacrificing short-term profits, and its refusal to deal is irrational but for its anticompetitive effects.

243.   VSP allows similarly situated optometry practices to be on its provider network.  VSP concedes that the only reason it refuses to deal with Total Vision is because Total-Vision-supported practices joined together in a practice group.  VSP claims this distinction is meaningful due to VSP's purported concern in protecting independent practices.  But VSP's rationalization is plainly pretextual, given that VSP, through various subsidiaries, operates well over 20 times the number of retail optometry practices as Total Vision.  The fact that VSP has allowed other private

equity-backed groups similar to Total Vision to remain on network—when they are not a threat to its retail clout—further undercuts VSP's narrative.

244.   VSP's willful maintenance of its monopoly by its refusal to deal has reduced competition, and that reduction in competition has caused antitrust injury to Plaintiffs and others.

## EIGHTH CAUSE OF ACTION

### (Intentional Interference with Prospective Business Relations)
### (Plaintiffs Against VSP)

245.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully restated herein.

246.   VSP was aware of Plaintiffs' prospective relationships with 41 independent optometry practices, including because Total Vision, LLC had discussed them with VSP numerous times.

247.   And yet, VSP willfully removed Total Vision practices from its "Premier" program, attempted to "Cap[] [Total Vision's] Growth," and refused to deal with Total Vision after Total Vision refused VSP's invitation to collude.

248.   As is unmistakable from VSP's documented desire to "Cap[] [Total Vision's] Growth," VSP intended to disrupt Plaintiffs' prospective economic relations with the relevant 41 optometry practices, and knew that disruption was likely due to VSP's conduct.

249.   Plaintiffs' relationships with these 41 optometry practices were in fact disrupted, as any such practice could not, as a matter of economic feasibility, join Total Vision were it thereby to be kicked out of VSP's monopoly vision insurance network.

250.   Plaintiffs were materially harmed by VSP's interference and disruption of their relationships with these 41 practices.

251. Eight of these 41 optometry practices had already signed letters of intent to join  and the evidence will show that others intended to (or were likely to) sign letters of intent as well, such that there can be no doubt that VSP's wrongful conduct was a substantial factor in causing the disruption of the prospective economic relationships and thereby causing the harm to Total Vision.

252. As a direct and proximate result of VSP's tortious conduct, Plaintiffs have been damaged in an amount to be proven at trial, together with interest thereon, attorneys' fees, and costs.

253. Plaintiffs are informed and believe and thereon allege that VSP, in doing the things alleged herein, acted willfully, maliciously, oppressively and with full knowledge of the adverse effects of its actions on Total Vision, and with willful and deliberate disregard of the consequences to Total Vision, such as to constitute oppression, fraud, and/or malice.  As a direct result of VSP's fraudulent, willful, and malicious conduct, Plaintiffs are entitled to exemplary and punitive damages pursuant to Civil Code § 3294 in an amount to be determined at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against VSP awarding Plaintiffs:

(a)     on the Second, Third, Fourth, Fifth, and Seventh Causes of Action, treble damages in an amount to be determined at trial;

(b)     on the First, Second, Third, Fourth, Fifth, Sixth, and Seventh Causes of Action, an injunction pursuant to 15 U.S.C. § 26, barring VSP from (i) seeking to limit Total Vision, P.C.'s growth, (ii) refusing to deal with Total Vision, including by removing Total Vision from its insurance network, and (iii) using its monopoly to force tying and other harm anticompetitive arrangements on Total Vision, P.C.;

(c)     on its Eighth Cause of Action, compensatory and punitive damages in amounts to be determined at trial;

(d)     Plaintiffs' costs in the prosecution of this action, including reasonable attorneys' fees; and

(e)     such other and further relief as is just and proper.

### **TRIAL BY JURY**

Trial by jury is demanded on all issues so triable.

DATED:  September 26, 2023          Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  /s/ *Adam B. Wolfson*
_____

Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
William R. Sears (Bar No. 330888)
willsears@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

*Attorneys for Plaintiffs Total Vision, LLC and Total Vision, P.C.*