QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
  William R. Sears (Bar No. 330888)
  willsears@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443 3000
Facsimile:   (213) 443 3100
*Attorneys for Plaintiffs Total Vision, LLC and Total Vision, P.C.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOTAL VISION, LLC and TOTAL VISION, P.C., | CASE NO. 8:23−cv−01805−CJC (DFMx) |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT** |
| v. | The Honorable Cormac J. Carney |
| VISION SERVICE PLAN a/k/a VSP GLOBAL, VISIONWORKS OF AMERICA, INC., VSP VENTURES MANAGEMENT SERVICES, LLC, ALTAIR EYEWEAR, INC., EYEFINITY, INC., MARCHON EYEWEAR, INC., PLEXUS OPTIX, INC., VSP LABS, INC., and EYECONIC, INC., | |
| Defendants. | |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...............................................................................................1

STATEMENT OF FACTS ................................................................................1

    A.   VSP Insures Total Vision's Doctors and Patients for Decades ..............1

    B.   2019 Agreement.........................................................................2

    C.   2020 Agreement.........................................................................3

    D.   VSP Terminates the Agreement ................................................5

ARGUMENT.....................................................................................................6

I.     PLAINTIFFS STATE PLAUSIBLE CLAIMS ............................................6

    A.   Plaintiffs State A Refusal-to-Deal Claim ...............................6

    B.   Plaintiffs State Monopolization and Attempted Monopolization Claims.........................................................................................7

         1.   VSP Has *and* is Dangerously Probable to Achieve Monopoly Power .................................................................7

         2.   VSP's Conduct is Predatory.................................................9

         3.   VSP's Conduct Harms the Relevant Market ...........................10

    C.   Plaintiffs State a Tying Claim ...............................................11

    D.   Plaintiffs State a UCL Claim .................................................12

    E.   Plaintiffs State a Tortious Interference Claim ....................13

    F.   The "Other" VSP Defendants Should Not Be Dismissed ...................14

II.    THE RELEASE DOES NOT BAR PLAINTIFFS' CLAIMS .......................15

    A.   Total Vision, P.C. is Not Bound By the Release ...............15

    B.   The Release is Part and Parcel of VSP's Anticompetitive Scheme......16

    C.   The Release is Unconscionable.............................................18

CONCLUSION ...............................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*49er Chevrolet, Inc. v. Gen. Motors Corp.*
   803 F.2d 1463 (9th Cir. 1986)...................................................................12

*A & M Produce Co. v. FMC Corp.*,
   186 Cal. Rptr. 114 (Cal. App. 4th Dist. 1982) ...................................19

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*
   836 F.3d 1171 (9th Cir. 2016)...................................................................12

*Altitude Sports & Ent., LLC v. Comcast Corp.*,
   2020 WL 8255520 (D. Colo. Nov. 25, 2020) .......................................7

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
   6 P.3d 669 (Cal. 2000) ...............................................................................18

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985)...............................................................6, 7, 9, 10

*Azizian v. Federated Dep't Stores, Inc.*,
   499 F.3d 950 (9th Cir. 2007) ..................................................................20

*Bakersfield College v. California Community College Athletic Assn.*,
   254 Cal. Rptr. 3d 470 (Cal. App. 3d Dist. 2019) .............................20

*Bold Ltd. v. Rocket Resume, Inc.*,
   2023 WL 4157626 (N.D. Cal. June 22, 2023) ...................................13

*Brokerage Concepts, Inc. v. Healthcare, Inc.*,
   140 F.3d 494 (3d Cir. 1998).............................................................. 11-12

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)......................................................................................8

*Brown v. Daikin Am. Inc.*,
   756 F.3d 219 (2d Cir. 2014)....................................................................16

*Carlson v. Home Team Pest Def., Inc.*,
   191 Cal. Rptr. 3d 29 (Cal. App. 1st Dist. 2015)...............................20

*In re Carrier IQ, Inc. Consumer Privacy Litig.,*
    78 F. Supp. 3d 1051 (N.D. Cal. 2015)......................................................13

*Carter v. Twentieth Century-Fox Film Corp.,*
    127 F. Supp. 675 (W.D. Mo. 1955)...............................................17, 18

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
    20 Cal. 4th 163 (1999) .............................................................................12

*Chavez v. Whirlpool Corp.,*
    93 Cal. App. 4th 363 (Cal. 2001) ..........................................................13

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690 (1962)...................................................................................10

*Copperweld Corp. v. Indep. Tube Corp.,*
    467 U.S. 752 (1984).....................................................................................15

*CRST Van Expedited, Inc. v. Werner Enters., Inc.,*
    479 F.3d 1099 (9th Cir. 2007).................................................................14

*Datagate, Inc. v. Hewlett–Packard Co.,*
    60 F.3d 1421 (9th Cir. 1995)....................................................................11

*Dobbins v. Kawasaki Motors Corp., U.S.A.,*
    362 F. Supp. 54 (D. Or. 1973)..................................................................17

*E. W. Stone, LLC v. Wei Shao,*
    2011 WL 5914282 (S.D. Cal. Nov. 28, 2011) .....................................14

*Epic Games, Inc. v. Apple, Inc.,*
    67 F.4th 946 (9th Cir. 2023)...................................................................13

*Fireworks Lady & Co. v. Firstrans Int'l Co.,*
    2019 WL 6448943 (C.D. Cal. Aug. 8, 2019).......................................12

*Fitz v. NCR Corp.,*
    13 Cal. Rptr. 3d 88 (Cal. App. 4th Dist. 2004) ...............................20

*FTC v. Qualcomm Inc.,*
    969 F.3d 974 (9th Cir. 2020).............................................................6, 11

*Harper v. Ultimo,*
    7 Cal. Rptr. 3d 418 (Cal. App. 4th Dist. 2003) ...............................21

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
627 F.2d 919 (9th Cir. 1980) ................................................................. 8

*ITT World Commc'ns Inc. v. W. Union Tel. Co.*,
524 F. Supp. 702 (S.D.N.Y. 1981) ........................................................ 10

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
547 U.S. 28 (2006) ................................................................................ 11

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) .................................................................................. 11

*Little v. Auto Stiegler, Inc.*,
63 P.3d 979 (Cal. 2003) ........................................................................ 21

*Nagrampa v. MailCoups, Inc.*,
469 F.3d 1257 (9th Cir. 2006) .............................................................. 19

*Nelson v. Dual Diagnosis Treatment Ctr., Inc.*,
77 Cal. App. 5th 643 (Cal. App. 4th Dist. 2022) .................................. 20

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
967 F. Supp. 2d 1347 (N.D. Cal. 2013) .............................................. 8-9

*Origami Owl LLC v. Mayo*,
2015 WL 4747101 (D. Ariz. Aug. 7, 2015) ......................................... 12

*Osborn v. Sinclair Ref. Co.*,
324 F.2d 566 (4th Cir. 1963) .................................................................. 7

*OTO, L.L.C. v. Kho*,
447 P.3d 680 (Cal. 2019) ...................................................................... 18

*Pac. Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*,
526 F.2d 1196 (9th Cir. 1975) ................................................................ 8

*Pokorny v. Quixtar, Inc.*,
601 F.3d 987 (9th Cir. 2010) ................................................................ 20

*Powell v. Cent. Cal. Fed. Sav. & Loan Ass'n*,
59 Cal. App. 3d 540 (Cal. App. 3rd Dist. 1976) .................................. 19

*Radio Corp. of Am. v. Raytheon Mfg. Co.*,
296 U.S. 459 (1935) .............................................................................. 17

*RealPage, Inc. v. Yardi Systems, Inc.*,
   852 F. Supp. 2d 1215 (C.D. Cal. 2012) ...........................................................11

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .............................................................................8

*Saika v. Gold*,
   56 Cal. Rptr. 2d 922 (Cal. App. 4th Dist. 1996) ............................................21

*Santa Fe Props., LP v. Source Bioscience, Inc.*,
   2021 WL 6104156 (C.D. Cal. Feb. 10, 2021) ..................................................14

*Serafin v. Balco Props. Ltd.*,
   235 Cal. App. 4th 165 (Cal. App. 1st Dist. 2015) ......................................20-21

*Sidibe v. Sutter Health*,
   2021 WL 4812445 (N.D. Cal. Sept. 17, 2021) ................................................12

*St. Louis Conv. and Visitors Commn. v. Nat'l Football League*,
   46 F. Supp. 2d 1058 (E.D. Mo. 1997) .............................................................17

*Szetela v. Discover Bank*,
   97 Cal. App. 4th 1094 (Ct. App. 2002) ...........................................................19

*Top Rank, Inc. v. Haymon*,
   2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ....................................................8

*Traffic Scan Network, Inc. v. Winston*,
   1993 WL 390144 (E.D. La. Sept. 24, 1993) ...............................................17, 18

*Tyntec Inc. v. Syniverse Techs., LLC*,
   2017 WL 2733763 (M.D. Fla. June 26, 2017) ................................................6-7

*U.S. Legal Support, Inc. v. Hofioni*,
   2013 WL 6844756 (E.D. Cal. Dec. 20, 2013) ..................................................13

*Unigestion Holding, S.A. v. UPM Tech., Inc.*
   (D. Or. 2018) 305 F. Supp. 3d 1134 .................................................................14

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966).............................................................................................7

*VKK Corp. v. Nat'l Football League*,
   244 F.3d 114 (2d Cir. 2001).........................................................................15, 17

*Vollrath Co. v. Sammi Corp.*,
  9 F.3d 1455 (9th Cir. 1993)..................................................................................14

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*,
  668 F.2d 1014 (9th Cir. 1981)...............................................................................9

*Williams v. Mohawk Industries Inc.*,
  314 F. Supp. 2d 1333 (N.D. Ga. 2004)...............................................................16

**<u>Statutes</u>**

Cal. Civ. Code § 1654............................................................................................16

**<u>Treatises</u>**

Herbert Hovenkamp & Phillip E. Areeda, *Antitrust Law: An Analysis of*
  *Antitrust Principles and Their Application* (2022) .....................................8, 11

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Defendant VSP has long dominated the vision insurance market. As the complaint details, VSP, with assistance from its defendant subsidiaries, seeks to expand its empire over all aspects of vision care, from independent optometry services to frames, lenses, and back-office optometry software. It can do so not because its products are better, but because its monopoly power in the vision insurance market allows it to foist one-sided arrangements on optometrists, who have no choice but to accept or (as Plaintiffs learned) get kicked off VSP's network. Squashing rivals in the independent optometry market reinforces VSP's hegemony over the vision insurance market, as groups like Total Vision are unable to gather enough clout to shift (or threaten to shift) patients to alternate providers. This conduct constitutes monopolization of the vision insurance market and attempted monopolization of other markets.

Defendants' primary strategy is to ignore the plausible allegations in the complaint, which, for the reasons discussed below, fails. Defendants also seek recourse from a lopsided release VSP procured from Total Vision, LLC by threat. But that release is legally invalid because it is unconscionable, and is part and parcel of Defendants' anticompetitive scheme. Moreover, it does not apply to Total Vision, P.C., a completely separate entity that actually owns the practices. Defendants' motion should thus be denied.

## STATEMENT OF FACTS

### A.    VSP Insures Total Vision's Doctors and Patients for Decades

Total Vision ("TV") is a California business that supports independent optometry practices. These practices are owned by Total Vision, P.C. ("PC") and achieve economies of scale by contributing their nonclinical business and administrative functions to another company, Total Vision, LLC ("LLC"), allowing optometrists to focus on patient care. Compl. ¶ 2.

VSP has monopolized the vision insurance market for decades.  *See id*. ¶¶ 41-44.  Nationally, VSP has 65% of the vision insurance market, which is commensurate with its share in California (as TV's practices demonstrate).  *Id*. ¶¶ 45-46, 48, 52.  There are also substantial barriers to new entry in vision insurance.  *Id*. ¶ 50.  Defendants do not challenge these market definition or power allegations.

Given its monopoly power, TV practices and patients have been covered by VSP for decades—it is a "must have."  *Id*. ¶¶ 1, 5, 7, 90, 141, 188.  As such, even before forming TV, TV's founders approached VSP seeking assurance that it would keep TV's practices in-network, which VSP confirmed throughout 2019; *i.e.*, promising that independent practices would remain in-network after joining TV.  *Id*. ¶¶ 55-56.

But around this time, VSP also itself entered the independent optometry practice market—again, a market definition Defendants do not challenge.  *Id*. ¶¶ 72-73.  First, VSP launched Defendant VSP Ventures, which competes with TV to acquire and run independent practices.  *Id*. ¶ 73.  Then, VSP acquired Defendant Visionworks, which operated over 700 optometry locations in over 40 states, was the seventh-largest optical retailer in the nation in 2021, and still continues to rapidly expand in California.  *Id*. ¶¶ 77, 78.  VSP began to use its insurance monopoly to foist harmful arrangements on provider groups like TV, who were now its direct competitors.  *Id*. ¶¶ 53, 80.

**B.     2019 Agreement**

In 2019, LLC and VSP entered into the "2019 Agreement," which automatically renewed annually.  *Id*. ¶ 56.  VSP imposed several terms that benefited VSP, but harmed competition and consumers.  The 2019 Agreement: (1) limited TV's growth by allowing VSP to deny coverage if TV's market share reached certain benchmarks; (2) required each TV practice to purchase an average of $35,000 in frames produced by Defendants Marchon and Altair (VSP's subsidiaries) per year;

and (3) required TV to ensure that at least 50% of its lens sales were Unity lenses. *Id*. ¶¶ 57-68. VSP uses similar terms across the industry. *Id.* ¶¶ 59, 115, 178-79.

These provisions harmed TV practices by making them less profitable, *id.* ¶¶ 60, 62, 65, 66; restrained competition by propping up VSP subsidiaries and limiting the growth of groups like TV, *id.* ¶¶ 57-68, 142; and harmed consumers by reducing retail options and price competition. *Id*. These terms had no procompetitive rationale, and were geared towards sidelining competitors and entrenching VSP's monopoly in the vision insurance market. *Id*. ¶¶ 71, 142. Still, LLC had no choice but to accept because VSP insurance is a "must have," particularly given its prevalence in California. *Id.* ¶¶ 1, 40, 52, 74.

## C. 2020 Agreement

In 2020, VSP dramatically accelerated its anticompetitive scheme. VSP suddenly removed TV practices from its "Premier" program, making it harder for patients to learn about them. While VSP claimed that it was removing all non-doctor-owned practices, it bent that rule for groups like Visionworks. *Id*. ¶¶ 79-81. When TV protested, VSP unveiled its intentions: TV could only remain on the "Premier" program if VSP acquired or invested in TV. *Id.* ¶ 82.

In February 2020, VSP sent TV a letter terminating the 2019 Agreement. The letter called the termination a "formality," noting that "in reality, [VSP] intend[s] to continue our relationship with [TV] while we work with you to establish new terms." *Id*. ¶ 83.

As negotiations progressed, VSP set up a meeting covering "Next step discussion points"—the first of which was "***Capping Location Growth***." *Id.* ¶ 85. VSP's Deputy General Counsel twice repeated its new business model was to "cap" TV's growth, but that TV could avoid these problems by selling itself to VSP. *Id.* ¶ 87. TV protested that this was an outright antitrust violation. *Id.* ¶ 86.

VSP retaliated. It called TV three days later, stating TV's practices were being taken off network. Instead of giving TV practices any lead time to process the

separation or notify their patients, VSP immediately began calling patients itself to report the news. *Id*. ¶ 89. This threw TV practices into complete chaos, with doctors scrambling to find alternate coverage for patients, patients suddenly forced to either pay out of pocket or part ways with longtime providers, and TV facing the prospect of going out of business. *Id*. ¶¶ 9, 90-91. The disruption came while TV was negotiating agreements with 41 independent practices seeking to join TV—which VSP well knew and which it disrupted. *Id*. ¶¶ 92-95.

VSP took advantage of this tumult to push through a new 2020 Agreement with even more anticompetitive terms. *Id*. ¶¶ 90-96. LLC had no choice but to accept these terms to restore order to its business and safeguard its practices' and patients' continued access to VSP's network. *Id*. In addition to the 2019 Agreement's harmful provisions, the 2020 Agreement: (1) capped TV's total in-network locations at 70; (2) added that each TV practice must dedicate 50% of its board space to Marchon and Altair frames; (3) added that if less than 50% of a practice's lens sales were Unity lenses, the practice must pay for the shortfall; (4) significantly reduced doctors' reimbursement rates; (5) required VSP's consent for "[a]ny change in control of [TV]," noting that VSP had "no obligation to consent in its sole and absolute discretion"; and (6) contained a de facto one-sided "Release" of claims. The Release—for "any and all causes of action and claims for relief, known or unknown"—created an exception for a breach of the 2020 Agreement. In other words, while LLC ostensibly could not *challenge* the agreement, VSP could *enforce* the agreement. The Release also capped recoverable damages at $250,000: a useful amount for enforcement actions, but low enough to make antitrust litigation irrational. Finally, the Release allowed either party to recover *all* legal fees if *any part* of claims brought were found to be released. *Id*. ¶¶ 97-109.

The Release was part and parcel of VSP's anticompetitive scheme. VSP insisted on these provisions not because they were reasonable, but to minimize the chance that LLC would seek relief from its patently anticompetitive conduct. It did

this *after* LLC raised antitrust concerns, and while it knew TV had no choice but to accept the agreement. *Id.* ¶ 110.

### D.    VSP Terminates the Agreement

In 2022, VSP's then-COO reached out to TV, reminding it that "your contract is coming up for renewal" and "we need to discuss what we can do to keep you in network." During that call, he asked about purchasing TV. *Id.* ¶¶ 122-26.

It became clear that VSP planned to leverage its monopoly power to buy TV at a fire-sale price. VSP sent TV a letter purporting to "remind" TV that the 2020 Agreement would expire on September 29, 2023. The letter bizarrely arrived 7.5 months prior to renewal—VSP usually sent such letters at the one-year mark. *Id.* ¶ 129. It was the first time after executing the 2020 Agreement that VSP raised the possibility of nonrenewal, contrary to multiple VSP executives' indications that VSP would keep TV in-network for the indefinite future. *Id.* ¶¶ 129, 133. The letter also emphasized VSP's right to withhold consent of TV's sale to any other bidder. *Id.* ¶¶ 129-30.

VSP's acquisition offer was ludicrously low. Its "high" valuation was less than *half* of offers from other firms. *Id.* ¶ 131. When TV rejected VSP's offer, VSP stopped responding—until it sent a March 7 notice of nonrenewal. *Id.* ¶ 132-33.

This was a slap in the face to TV: VSP had profited handsomely under the Agreements, and VSP leaders had repeatedly expressed interest in renewing the Agreement (and continued to do so as late as June 2023). *Id.* ¶ 133, 138. TV also understands VSP used similar tactics with others in the industry. *Id.* ¶ 142. Because of VSP's refusal to renew a decades-long course of dealing, provider groups like TV will suffer, VSP will further squelch competition in the vision insurance market, and countless patients will lose access to their preferred doctors. *Id.* ¶¶ 142-43.

VSP's explanation for rebuffing TV—that TV practices are not "completely" owned by optometrists—is pretextual. VSP's Visionworks remains in-network despite being owned by a large corporation. *Id.* ¶¶ 133, 243. VSP's actual motivation

-5-

Case No. 8:23–cv–01805–CJC (DFMx)

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT

is to squash potential rivals and entrench its domination over all aspects of vision care. *Id*. ¶¶ 137-40.  TV is but one example; VSP's conduct is market-wide.

## ARGUMENT

## I.   PLAINTIFFS STATE PLAUSIBLE CLAIMS

### A.   Plaintiffs State A Refusal-to-Deal Claim

Under the Supreme Court's decision in *Aspen Skiing*, a company violates Section 2 when "(1) it unilaterally terminates a voluntary and profitable course of dealing; (2) the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition; and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993-94 (9th Cir. 2020) (cleaned up).

Plaintiffs' allegations place VSP squarely within this paradigm.  VSP terminated a decades-long course of dealing under which it extended network coverage to TV practices and reaped millions of dollars in return, Compl. ¶¶ 5, 138, 242; VSP's refusal to deal is irrational but for the possibility of reaping higher profits in the long run by driving competitors like TV out of the independent optometry market, *id.* ¶¶ 138-40; and VSP allows other non-doctor-owned groups on its provider network, notably its own subsidiary, Visionworks, *id.*

VSP does not dispute the second or third elements.  Instead, VSP contends that, because the 2020 Agreement was set to expire after three years, Plaintiffs cannot allege a past voluntary relationship.  Br. at 10.  Contrary to VSP's assertion that agreements of a fixed duration cannot give rise to refusal-to-deal liability, ***Aspen Skiing*** involved a seasonal arrangement that terminated each year, and was only renewed with the consent of the parties, just like the 2020 Agreement.  *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 585 (1985).  Numerous other courts have likewise allowed refusal-to-deal claims to proceed even where, as here, the agreement at issue did not extend indefinitely.  *See Tyntec Inc. v. Syniverse*

*Techs., LLC*, 2017 WL 2733763, at *2 (M.D. Fla. June 26, 2017) (plausible refusal-to-deal claim where agreement had option for one-year renewals); *Altitude Sports & Ent., LLC v. Comcast Corp.*, 2020 WL 8255520, at *11 (D. Colo. Nov. 25, 2020) (same, based on nonrenewal theory); *Osborn v. Sinclair Ref. Co.*, 324 F.2d 566, 569, 571 (4th Cir. 1963) (same, for company that terminated one-year lease). Adopting VSP's unsupported argument would upend settled law, including *Aspen Skiing*.

VSP also attempts to downplay its history with TV by suggesting that no course of dealing existed before the 2019 and 2020 Agreements, Br. 10, but VSP's dealings with TV's providers go back decades. Compl. ¶ 5. Moreover, VSP confuses a voluntary course of dealing with the existence of a formal agreement. In *Aspen Skiing*, the relevant course of dealing preceded a formal contract: it "was first developed when three independent companies operated three different ski mountains" and decided one "luncheon" on their arrangement. 472 U.S. at 603, 589 n.7. Here, too, an established and profitable course of dealing—VSP's network coverage of TV practices—preceded the formal contracts between TV and VSP. Compl. ¶¶ 5, 56. VSP's refusal marks a unilateral "decision by a monopolist" to suddenly extinguish "a pattern of distribution that had originated in a competitive market and had persisted for several years," just as *Aspen Skiing* forbids. 472 U.S. at 603-04.

## B.   Plaintiffs State Monopolization and Attempted Monopolization Claims

VSP's assertion that Plaintiffs have not pled (a) monopoly power, (b) predatory practices, or (c) conduct capable of enabling VSP to gain market power in the California vision insurance market falls flat in the face of the complaint and the law.

### 1.   VSP Has *and* is Dangerously Probable to Achieve Monopoly Power

The existence of monopoly power ordinarily may be inferred from the predominant share of the market. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). It is "reasonable to presume the existence of [monopoly power]" when a

firm's market share has consistently exceeded 60%.  Herbert Hovenkamp & Phillip E. Areeda, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* 801 (2022); *see also, Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980) (65% market share sufficient to infer monopoly power); *Pac. Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975) (45-70% sufficient).  For attempted monopolization claims, less than 50% share is sufficient if it is dangerously probable a successful scheme would provide the defendant with monopoly power.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (44% share).

VSP easily surpasses these thresholds:  VSP's national share of patients with vision insurance approaches 65%, and its share of the fully-insured vision insurance market is 70%.  Compl. ¶ 48.  As early as three decades ago, VSP contracted with about 90% of California's optometrists in independent private practices.  *Id.* ¶ 44.  At TV, which is representative of the California market at large, VSP patients comprised 62% of exams and 66% of exams of insured patients, and VSP alone accounted for over 50% of TV's revenue (over three times the next largest carrier).  *Id.* ¶¶ 45, 52.  Unlike in VSP's cited cases, Br. 12-13, Plaintiffs have done "enough to raise a right to relief above the speculative level."  *See, e.g.*, *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *4, 8 (C.D. Cal. Oct. 16, 2015) (plaintiff alleged "no . . . facts or figures concerning [the relevant market]").

VSP's contention that Plaintiffs' allegations are "untethered" from the market for vision insurance for independent optometry practices in California, Br. 12-13, ignores Plaintiffs' well-pleaded allegations that VSP possesses monopoly power in ***California***, as described above.  *Id.* ¶¶ 44, 48, 52.  Plaintiffs' allegations about the broader national market and lesser included markets *contextualize* that allegation, but they are not Plaintiffs' only allegations of monopoly power.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 346 (1962) (national figures "useful" when statistics in the relevant geographic market are unavailable); *Orchard Supply Hardware LLC v.*

*Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1363 (N.D. Cal. 2013) (dismissal unsuitable when the court can "plausibly infer . . . market power within . . . smaller markets" from "alleg[ations] that Defendants have market power generally in the United States").

## 2.    VSP's Conduct is Predatory

Actions are predatory when they "exclude rivals on some basis other than efficiency." *Aspen Skiing*, 472 U.S. at 605.  Here, Plaintiffs have plausibly alleged that VSP's conduct has entrenched its monopoly, Compl. ¶¶ 142, 189-91; stamped out rivals in the vision insurance and other related markets, *id*. ¶¶ 59-68, 71, 76, 81-89, 96-103, 115, 137-42; and deprived practices and patients of the benefits of vigorous competition, *id*. ¶¶ 60-66, 71, 98-100, 96-103.

Rather than addressing these allegations holistically, as required by law, VSP improperly responds to select allegations in isolation.  Br. 13-15.  But a monopolist's predatory conduct must be given "the full benefit of [plaintiffs'] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."  *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*, 668 F.2d 1014, 1038 (9th Cir. 1981).

VSP recounts only a few fragments of its predatory conduct, while conveniently omitting that it: reserved the right to deny coverage to TV-acquired practices based on TV's market penetration, Compl. ¶ 59; inflicted harmful tying arrangements interfering with doctors' judgment regarding patient needs, *id.* ¶¶ 60-66, 98-100; posed acquisition by VSP as a condition for TV to remain in-network, *id.* ¶ 82; kicked private equity-owned groups off network, but *only* in areas where they challenged VSP's monopoly, *id.* ¶¶ 76, 81; threatened to (and did) revoke TV providers' decades-long in-network status without legitimate business justification, *id.* ¶¶ 83-89, 129-33, 137-38, 140, 142; capped TV's total number of locations, *id.* ¶ 97; removed TV providers from its "Premier" banner, *id.* ¶¶ 79-82; reduced reimbursement rates for TV doctors without explanation, *id.* ¶ 101; forced TV to

declare an intent to exit the network while reassuring them that they would never have to, *id.* ¶ 103; imposed a massively one-sided release to purportedly absolve VSP of antitrust liability, ¶ 104-09; and attempted to buy TV at a fire-sale price, *id.* ¶¶ 129-33.

So, while VSP touts its entry into retail optometry as procompetitive, Br. 15, this ignores Plaintiffs' allegation that VSP did so as part of a broader scheme to stifle competition for retail optometry by stamping out competition.   Similarly, VSP's efforts to positively spin the in-network growth caps and change-of-control clauses it forced on TV, *id.* at 14, overlook Plaintiffs' allegations that VSP insisted on these terms to strengthen its hold over the vision insurance market and purchase TV at a below-market price.   Compl. ¶¶ 128-132.   Taken together, VSP's actions provide context for its true motivations and reveal its attempt to exclude rivals on a basis other than efficiency.   *Aspen Skiing*, 472 U.S. at 605; *see also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962) ("[A]cts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme."); *ITT World Commc'ns Inc. v. W. Union Tel. Co.*, 524 F. Supp. 702, 703-04 (S.D.N.Y. 1981) (antitrust claim sufficiently pled where an action "ordinarily . . . furthering competition" was "part of a more general scheme . . . to restrain competition").

### 3. VSP's Conduct Harms the Relevant Market

VSP's assertion that Plaintiffs allege no misconduct affecting the California vision insurance market, Br. 15, also fails.   Plaintiffs allege that, because individual optometrists lack the market presence to push back against VSP, VSP entrenches its vision insurance monopoly by halting the growth of any larger practice group (like TV) that can negotiate for better terms.   Compl. ¶¶ 142, 189-91, 198.   VSP continually prunes the independent optometry market such that no practice group can ever grow strong enough to challenge its control.   *Id.*   This allows VSP to monopolize the vision insurance market.   VSP simply ignores these well-pleaded allegations.

Moreover, Plaintiffs allege that VSP wields its monopoly power to harm competition in related markets.  By forcing practice groups to accept one-sided arrangements to stay in-network, VSP gives its own products an artificial boost in related markets for retail optometry, glasses frames, lenses, and practice management systems—harming competition and impairing TV's ability to shop for (and in turn offer patients) better products.  *Id.* ¶¶ 179-82, 196.  Because those markets are "in the area of effective competition," these allegations are not only relevant, but confirm Plaintiffs have stated a plausible claim.  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (courts must look at anticompetitive effects in "the area of effective competition").

**C.    Plaintiffs State a Tying Claim**

A tying claim alleges "a tie-in between two products or services sold in separately defined product markets."  *See RealPage, Inc. v. Yardi Systems, Inc*., 852 F. Supp. 2d 1215, 1222-1223 (C.D. Cal. 2012) (citing *Datagate, Inc. v. Hewlett–Packard Co.,* 60 F.3d 1421, 1423-24 (9th Cir. 1995)).  Plaintiffs allege that VSP tied access to its insurance to TV's purchase of frames, lenses, practice management software, and other products sold by VSP subsidiaries.  Compl. ¶¶ 98-100, 179-83.

VSP's argument that it does not sell insurance but rather *buys* optometry services, and thus cannot have tied two products or services, Br. 8, rests on an out-of-circuit summary judgment case that misapplied the law.  *Id.*  As the leading antitrust treatise explains, there is "no economic difference between buy and sell side tying."  Hovenkamp & Areeda, *supra* Section I.B.1, at 1700.  So, it makes no difference that VSP calls itself a "buyer"; what matters is that VSP has tied insurance to other products and services in a way that harms competition.  *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on separate grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

All of VSP's other authorities are non-binding or inapposite as well.  The court in *Brokerage Concepts, Inc. v. Healthcare, Inc.*, was "hesitant to [and did not]

conclude" that the arrangement between a healthcare provider and provider network did not fit into the "purchase sale paradigm." 140 F.3d 494, 511 (3d Cir. 1998).  The *49er Chevrolet, Inc. v. Gen. Motors Corp.* court based its decision "not on whether the challenged conduct can be labelled 'tying,' but rather on its competitive effect." 803 F.2d 1463, 1469 (9th Cir. 1986).  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.* declined to find "part delays, pricing decisions, and removal of technical data" for third party servicers "de facto" products tied to sales of parts to airlines.  836 F.3d 1171, 1178 (9th Cir. 2016).  VSP's citation to this Court's decision in *Fireworks Lady & Co. v. Firstrans Int'l Co.*, 2019 WL 6448943, at *3 (C.D. Cal. Aug. 8, 2019), is even further afield.  There, the Court declined to find two segments of a shipping journey discrete tied products, whereas here, the distinct nature of the tying (vision insurance) and tied products (frames and lenses) is clear.  *See* Compl. ¶¶ 155-76.

Even if the Court were to entertain VSP's argument that it does not sell insurance, defining the relevant market, including who are the "sellers or producers [that] have the actual or potential ability to deprive one another of significant levels of business" is typically "a factual inquiry for the jury."  *Origami Owl LLC v. Mayo*, 2015 WL 4747101, at *2-3 (D. Ariz. Aug. 7, 2015) (citation omitted); *see Sidibe v. Sutter Health*, 2021 WL 4812445 (N.D. Cal. Sept. 17, 2021) ("The identity of purchasers is not a settled issue as a matter of law"—the "jury [must] mak[e] its own finding.").

### D.   Plaintiffs State a UCL Claim

California's Unfair Competition Law ("UCL") is "sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (quotations omitted throughout).  Plaintiffs' federal antitrust and state tortious interference claims are both bases for an "unlawful" UCL claim.

For "unfair" business practice claims, California courts examine whether the unfair act is "tethered to some legislatively declared policy or proof of some actual or

threatened impact on competition." *Id.* at 187-88.  Even where a complaint does not use the word "tethered," courts find UCL claims plausible so long as they allege that the defendant's conduct threatens fair competition.  *See Bold Ltd. v. Rocket Resume, Inc.*, 2023 WL 4157626, at *6 (N.D. Cal. June 22, 2023) (denying motion to dismiss UCL claim because although plaintiff "failed to allege that Defendants' actions are tethered to any legislative policy, [plaintiff] has sufficiently pled an actual or threatened impact on competition."); *In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1116 (N.D. Cal. 2015) ("Plaintiffs need merely to show that the effects of [defendants'] conduct 'are comparable to or the same as a violation of the law, or otherwise significantly threaten[] or harm[] competition.'" (emphasis omitted)).  Plaintiffs have done so here, for the reasons shown above.  *See* Compl. ¶¶ 71, 96, 142, 177-93; *supra* Section I.B.3.

Under this standard, even if Defendants defeat Plaintiffs' federal antitrust claims, that is not a get-out-of-jail-free card under the UCL, because "*Cel-Tech* does not require plaintiffs to base UCL unfair conduct claims solely on antitrust violations."  *See U.S. Legal Support, Inc. v. Hofioni*, 2013 WL 6844756, at *14 (E.D. Cal. Dec. 20, 2013) (denying motion to dismiss); *see also Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (Cal. 2001) (cited in Br. 17) ("We do not hold that in all circumstances an 'unfair' business act or practice must violate an antitrust law to be actionable under the unfair competition law.").  Thus, the Ninth Circuit recently upheld a UCL claim despite a failure of proof on related antitrust claims, because the defendant unquestionably caused substantial anticompetitive effects.  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 984-85, 1001 (9th Cir. 2023).

### E.    Plaintiffs State a Tortious Interference Claim

Plaintiffs must show: (1) an economic relationship with a third party, with the probability of future economic benefit to Plaintiffs; (2) VSP's knowledge of the relationship; (3) intentional acts by VSP designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by

the defendant's acts. *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1107-08 (9th Cir. 2007). Plaintiffs allege each element. The complaint alleges: (1) TV was in advanced negotiations with 41 practices, with eight signed letters of intent, Compl. ¶¶ 92, 251; (2) VSP knew of those negotiations, *id.* ¶¶ 93, 246; (3) VSP intentionally interfered by capping TV's growth, *id.* ¶¶ 85-87, 94, 248; (4) these relationships were disrupted, *id.* ¶¶ 95, 247; and (5) TV suffered economic harm, *id.* ¶¶ 95, 250, 252. VSP's claim that TV was required to identify the 41 practices by name misreads its own case, which says only that the prospective counterparties must be "identifiable," as they are here. *Santa Fe Props., LP v. Source Bioscience, Inc.*, 2021 WL 6104156, at *3 (C.D. Cal. Feb. 10, 2021) (cited in Br. 18-19).

Plaintiffs' tortious interference claim is not time-barred, because VSP's tortious conduct extended into 2022 and 2023. Compl. ¶¶ 10, 133. Where, as here, a defendant's tortious conduct occurs both during and outside of the statute of limitations, "[t]he continuing violations doctrine permits recovery for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct within the limitations period." *E. W. Stone, LLC v. Wei Shao*, 2011 WL 5914282, at *4 (S.D. Cal. Nov. 28, 2011). VSP's anticompetitive efforts to coerce TV into selling itself in 2020 and 2022 are sufficiently linked—they are part of the same monopolistic scheme.

### F.    The "Other" VSP Defendants Should Not Be Dismissed

Under Section 2, courts consider a parent and its wholly-owned subsidiaries as a single entity. "'[I]t is the affiliated corporations' collective conduct . . . that matters;' "specific defendants [need not] independently satisfy each element." *Unigestion Holding, S.A. v. UPM Tech., Inc.* (D. Or. 2018) 305 F. Supp. 3d 1134, 1145-1146; *see Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1461 (9th Cir. 1993) (sister and parent companies were "part of an integrated entity" whose behavior was jointly subject to Section 2).

Plaintiffs allege coordinated action by VSP and its wholly-owned subsidiaries. VSP Ventures' acquisition of independent practices helps facilitate VSP's dominance in the vision insurance market, and vice versa, as VSP threatens to revoke network status for practices that do not sell to VSP Ventures.  Compl. ¶¶ 4, 13, 38, 53, 73-74. VSP Ventures bids directly against TV for independent practices in California while Visionworks runs the practices that compete.  *Id.* ¶¶ 4, 73.  VSP acts on behalf of Altair, Eyefinity, Marchon, Plexus, VSP Labs, and Eyeconic to impose anticompetitive terms on their behalf and everyone profits.  *Id.* ¶¶ 5, 60-66, 98-100. VSP and its subsidiaries are operating with complete unity of interest and thus are all liable.  *E.g.*, *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771-72 (1984).

## II.   THE RELEASE DOES NOT BAR PLAINTIFFS' CLAIMS

### A.   Total Vision, P.C. is Not Bound By the Release

VSP tries to escape liability by invoking the 2020 Agreement's release, Br. 5, but this defense fails too.  PC is not bound by the release as it was not a party to the 2020 Agreement—only **LLC** signed the Agreement.  Compl. ¶ 116.  VSP is a sophisticated actor that could have asked PC to be a party to the contract or referred to PC in the release.  It did neither, precluding it from enforcing the release against PC.  *See VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001) (release did not cover third parties where parties seeking enforcement were "sophisticated commercial actors who could have specifically referred to [third parties] had they intended to include them in the Release").

Defendants cobble together disparate parts of the Agreement in an attempt to bind PC, but their arguments butcher its plain terms.  *First*, although VSP claims that a purported "goal" of the 2020 Agreement was to bind "affiliated Providers," Br. 6-7, the Agreement itself states that "Providers are not parties to this agreement."  Br. Ex. 2 ¶ 1.30.

*Second*, LLC and PC are not "affiliated entities" under the Agreement.  They are separate entities with distinct directors and officers and related by nothing more

than an arms-length agreement.  Compl. ¶¶ 2, 30, 116, 117.  The 2020 Agreement makes clear that PC is not an affiliate by defining "Indemnitee" to include "[LLC], its Affiliates, [and] *the Optometry Practices*."  In other words, "Optometry Practices"—which Defendants argue include PC—are expressly distinguished from "Affiliates." *See* Compl. ¶ 119.

*Third*, Defendants make much of out-of-context statements in the Complaint that each *independent practice* is "operated and controlled" by a licensed optometrist and that optometrists "effectively own" TV.  Br. 7; Compl. ¶¶ 3, 30, 81, 140.  These statements do not show that LLC and PC share common ownership and control.  The optometrists that run TV practices do not "operate and control" TV as a whole in the same way that restaurant franchisees operate and control their location, but have no say over corporate strategy.  And as Plaintiffs have clearly stated, PC is wholly owned by an individual physician.  That physician has no ownership or control of LLC.  Compl. ¶ 30; *see* Corp. Disclosure Statement.

To the extent it is unclear whether LLC and PC are affiliates, California courts read contract ambiguities against the party that drafted the contract.  Cal. Civ. Code § 1654.  Moreover, this factual question regarding the relationship between PC and LLC cannot be resolved at the motion-to-dismiss stage.  *See Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014) (vacating dismissal because "[w]hether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact not suitable to resolution on a motion to dismiss."); *Williams v. Mohawk Industries Inc.*, 314 F. Supp. 2d 1333, 1349 (N.D. Ga. 2004) (denying motion to dismiss because "[a]t this stage in the litigation, … the Court need only determine whether the Complaint sufficiently alleges the existence of an enterprise separate from Defendant.").

**B.    The Release is Part and Parcel of VSP's Anticompetitive Scheme**

VSP insisted on the release after TV raised concerns about VSP's anticompetitive conduct, and it is designed to prevent LLC from bringing antitrust

claims against VSP.  Compl. ¶ 110.  The release is thus "so much a part of an illegal transaction as to be void in its inception." *Radio Corp. of Am. v. Raytheon Mfg. Co.*, 296 U.S. 459, 462 (1935).

Courts have long recognized that a release is invalid if it is "part and parcel" of—*i.e.*, "integral" to—an antitrust conspiracy. *VKK Corp.*, 244 F.3d at 125.  "A part and parcel argument may be used by a plaintiff to avoid a release in an antitrust action where it is shown that the release was an object of the combination or conspiracy or where it was an integral part of the scheme in restraint of trade." *Dobbins v. Kawasaki Motors Corp., U.S.A.*, 362 F. Supp. 54, 58 (D. Or. 1973).

*First*, where, as here, a release is "executed simultaneously with" an agreement that *itself* violates the antitrust laws, that release is void as an "integral part of" the anticompetitive scheme.  *St. Louis Conv. and Visitors Commn. v. Nat'l Football League*, 46 F. Supp. 2d 1058, 1061 (E.D. Mo. 1997); *see also Traffic Scan Network, Inc. v. Winston*, 1993 WL 390144, at *2 (E.D. La. Sept. 24, 1993) (same); *Carter v. Twentieth Century-Fox Film Corp.*, 127 F. Supp. 675, 678 (W.D. Mo. 1955) (denying summary judgment for defendant where release was in contract that was part of defendant's plan to obtain a monopoly).

Accepting the allegations in the complaint as true, the Agreement is itself an "unreasonable restraint of . . . trade" and therefore "invalid in all its parts," including the release.  *Carter*, 127 F. Supp. at 678, 680.  Absent the incorrect arguments discussed above, VSP offers no argument that the complaint implausibly alleges the 2020 Agreement *itself* is anticompetitive.

*Second*, the release was executed simultaneously with, and was an object of, VSP's anticompetitive scheme.  The 2020 Agreement was executed at the time that VSP had designs to dominate the independent optometry practice market.  *Id.* ¶¶ 53, 72; *see Carter*, 127 F. Supp. at 678 (allegation that contract was executed "at the time" the defendant was engaged in a monopolistic conspiracy was enough to generate "an inference" that the contract was an "object of the conspiracy").  The timeline further

reveals that the release was part of VSP's attempt to smooth its path to monopoly—VSP only imposed a release *after* Plaintiffs raised concerns about its anticompetitive behavior.  Compl. ¶ 110.

*Third*, the release is "integral" to VSP's illegal contract in that it is designed to allow VSP to perpetrate its anticompetitive campaign without fear of lawsuit.  Although styled as "mutual," the release is crafted such that LLC cannot bring any claims challenging the agreement, while VSP can bring claims enforcing it.  *Id*. ¶¶ 105-07.  The covenant not to sue is also constructed to allow VSP to dodge claims relating to VSP's anticompetitive removal of doctors from its network, as VSP brazenly demonstrates in its motion.  *See* Br. 6.

It suffices at this stage that Plaintiffs have alleged the release is part and parcel of an illegal scheme.  To the extent VSP disputes the 2020 Agreement's illegality, this fact-intensive issue cannot be resolved at the pleading stage.  *See Carter*, 127 F. Supp. at 679 (the "unreasonableness" of a restrictive covenant is a "mixed question of law and fact for determination by a jury"); *Traffic Scan*, 1993 WL 390144, at *2 (denying summary judgment where, "drawing … inferences from the underlying facts viewed in a light most favorable to [the plaintiff]," "the release *may* be invalid as an integral part of the alleged antitrust scheme").

## C.    The Release is Unconscionable

The release is also unenforceable because it is procedurally and substantively unconscionable.  LLC "lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to" VSP.  *OTO, L.L.C. v. Kho*, 447 P.3d 680, 689 (Cal. 2019).

Unconscionability is evaluated on a sliding scale:  "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."  *Armendariz v. Found. Health Psychcare Servs., Inc*., 6 P.3d 669, 690 (Cal. 2000).

***The release was the product of procedural unconscionability***.   A clause is procedurally unconscionable when one in a "weaker bargaining position" must "'take it or leave it' without the opportunity for meaningful negotiation." *Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1100 (Ct. App. 2002).   This occurs where the "weaker party, in need of the goods or services, is . . . [n]ot in a position to shop around for better terms, . . . because the author of the standard contract has a monopoly." *Powell v. Cent. Cal. Fed. Sav. & Loan Ass'n*, 59 Cal. App. 3d 540, 550 (Cal. App. 3rd Dist. 1976).

Here, VSP wields superior bargaining power because of its monopoly over vision insurance.   *See supra* Section I.B.1.   Providers like TV have no meaningful market alternatives because VSP has long been the largest vision insurer:   any reasonable provider knows it must contract with VSP to remain viable.   Compl. ¶ 74.   Providers also do not have the option of choosing insurers as they please; patients or their employers do.   *Id.* ¶¶ 47, 156.   VSP alone accounts for ***over 50%*** of TV's revenue, and TV knew going off network would cause it to lose a quarter of its patients overnight and foreclose it from the market going forward.   *Id.* ¶¶ 52, 46.   It would also threaten the continued vitality of its practices and upend dozens of established, decades-long, doctor-patient relationships—as TV learned when VSP cut its network access in 2019.   *Id.* ¶¶ 90-91.   Thus, when VSP exploited this power to strongarm LLC into signing an unfavorable release, LLC had no choice but to accept or else risk throwing its practices into disarray.   *Id.* ¶ 46.

That the parties were arguably sophisticated does not preclude a finding of procedural unconscionability:   "[T]he sophistication of a party, alone, cannot defeat a procedural unconscionability claim." *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1283 (9th Cir. 2006).   "[E]ven large business entities may have relatively little bargaining power, depending on the identity of the other contracting party and the commercial circumstances surrounding the agreement." *A & M Produce Co. v. FMC Corp.*, 186 Cal. Rptr. 114, 124 (Cal. App. 4th Dist. 1982).

***The release is substantively unconscionable.*** "[T]he paramount consideration in assessing [substantive] unconscionability is mutuality." *Bakersfield College v. California Community College Athletic Assn*., 254 Cal. Rptr. 3d 470, 481 (Cal. App. 3d Dist. 2019). The release imposes de facto one-sided terms on LLC for three reasons.

*First*, it bars all claims except those that only VSP might bring. Compl. ¶¶ 105-07. California law does not condone broad unilateral releases of claims, *see Nelson v. Dual Diagnosis Treatment Ctr., Inc*., 77 Cal. App. 5th 643, 663 (Cal. App. 4th Dist. 2022), and agreements that limit legal recourse for one party only are regularly found unconscionable, *see, e.g.*, *Carlson v. Home Team Pest Def., Inc*., 191 Cal. Rptr. 3d 29, 41 (Cal. App. 1st Dist. 2015) (clause exempting the stronger party "from having to arbitrate its most likely claims against [the weaker party]" while requiring the weaker party "to relinquish [their] access to the courts for all [their] nonstatutory claims" was substantively unconscionable); *Fitz v. NCR Corp*., 13 Cal. Rptr. 3d 88, 104-05 (Cal. App. 4th Dist. 2004) (agreement "compel[ling] arbitration of the claims more likely to be brought by . . . the weaker party . . . [while] exempt[ing] from arbitration the types of claims that are more likely to be brought by . . . the stronger party" was substantively unconscionable).

*Second*, the release makes it incredibly costly for TV to challenge the agreement by mandating that TV pay *all* of VSP's legal fees and costs if even a part of its action is dismissed. *Id*. ¶ 108. This contravenes the antitrust laws, which only allow a *plaintiff* to recover fees from a defendant, and which forbid fee-shifting the other way—in *any* way. *See Azizian v. Federated Dep't Stores, Inc*., 499 F.3d 950, 959-60 (9th Cir. 2007). Fee-shifting provisions that shift more risk to a plaintiff than permissible are substantively unconscionable. *See, e.g.*, *Pokorny v. Quixtar, Inc*., 601 F.3d 987, 1004 (9th Cir. 2010) (arbitration fee-shifting clause placing claimants at risk of incurring greater costs than they would bear if they were to litigate their RICO claims in federal court was unconscionable); *Serafin v. Balco Props. Ltd.*, 235 Cal.

App. 4th 165, 183-85 (Cal. App. 1st Dist. 2015) ("By requiring both parties to bear their own attorney's fees and costs, the provision before us also runs counter to FEHA which allows a successful plaintiff to recover attorney fees and costs from the employer.").

*Third*, the $250,000 damages cap contravenes the Clayton Act's provision for trebled damages for antitrust violations.  Compl. ¶ 109.  While purportedly mutual, the damages cap affects TV's claims far more than VSP's claims, making it unconscionable.  *Id.*; *see Little v. Auto Stiegler, Inc.*, 63 P.3d 979, 984-85 (Cal. 2003) (holding damages cap unconscionable where it "inordinately benefit[ed] defendants"); *Harper v. Ultimo*, 7 Cal. Rptr. 3d 418, 423 (Cal. App. 4th Dist. 2003) (finding damages cap unconscionable where "[t]he odds were far more likely that the customers would have claims . . . than the business would"); *Saika v. Gold*, 56 Cal. Rptr. 2d 922, 923 (Cal. App. 4th Dist. 1996) (finding facially mutual provision unconscionable where "the practical effect of the clause is to tilt the playing field in favor of" one party).

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

1    DATED:  January 8, 2024

2

3

4    By  /s/ *Adam B. Wolfson*

5        Adam B. Wolfson (Bar No. 262125)
         adamwolfson@quinnemanuel.com

6        William R. Sears (Bar No. 330888)

7        willsears@quinnemanuel.com

8        865 South Figueroa Street, 10th Floor
         Los Angeles, California 90017-2543

9        Telephone:  (213) 443-3000

10       Facsimile:   (213) 443-3100

11       *Attorneys for Plaintiffs Total Vision, LLC*
         *and Total Vision, P.C.*

12

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 8, 2024, a copy of PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT was served via CM/ECF to counsel for Defendants.

DATED: January 8, 2024        QUINN EMANUEL URQUHART & SULLIVAN, LLP


By  */s/ Adam B. Wolfson*
    Attorney for Plaintiffs

1

## **CERTIFICATE OF COMPLIANCE**

2    The undersigned, counsel of record for Plaintiffs, certifies that this brief contains

3  **6,998** words (as determined by the Microsoft Word word-processing system used to

4  prepare the brief), excluding the items exempted by Local Civil Rule 11-6.1, which

5  complies with the word limit of L.R. 11-6.1.

6  DATED: January 8, 2024            QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP
7

8

9
                                     By _/s/ Adam B. Wolfson_____
10                                       Attorney for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28